[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
William B., born July 15, 1989, was placed in DCF custody under an ex parte Order of Temporary Custody on August 13, 1997. The order was sustained at hearing and after the mother entered a nolo contendre plea to a neglect (denied proper care . . .) and uncared for (homeless specialized care) petition, the child was committed to the Department of Children and Families for one year to October 9, 1998. The father in North Carolina failed to appear. DCF initially took custody under temporary voluntary placement in 1991. In September, 1995, William was referred to DCF for fire setting and in early 1996 for possible sexual abuse. The initial DCF goal was reunification.
The commitment was extended for one year to October 9, 1999. The mother filed a motion to revoke on January 5, 1999. C. P. B. 33-10. DCF filed a petition to terminate parental rights on April 1, 1999, adjudication date. Motion and petition have been consolidated for these hearings which concluded on October 31, 1999, dispositional date. Revocation and termination raise different issues. Termination involves only whether it is in the best interest of a child to cut the legal parent-child relationship. Revocation, whether by parent or an intervener, ultimately involves custody. In re Carissa K., 55 Conn. App. 768
(1999): In re Denzel, 53 Conn. App. 827 (1999). If termination is granted, the motion to revoke will be moot. CT Page 16796
Subsequent to the filing of the termination petition, in accordance with a permanency plan the court extended the commitment to October 9, 2000 and found reunification efforts inappropriate for both parents. While those findings relieves the court from specific steps and DCF from pursuing court ordered physical reunification, the order did not preclude reunification efforts by the parents or bar appropriate contact between parents and child. In fact, the court sanctioned continued visitation in accordance with a prior court order. The court set Specific Steps on August 21, 1997 and Expectations on October 9, 1997. Exhibits S-4 and S-5. The mother executed three service agreements in September/October. 1997. Exhibits S 1-3.
Both mother and child were represented by counsel. While the parents have resided intermittently in North Carolina during these proceedings, the mother returned to Connecticut and attended the court proceedings. The father has never attended any court hearing except for the second day of the two day trial when he requested counsel; his request was denied. However, the father was given an opportunity at the conclusion of each witness to ask any additional questions and to participate in the oral argument; the father stated that he and the mother had the same goals for their son.
Three of the termination grounds are filed against both parents: abandonment, Conn. Gen. Stat. § 17a-112(c)(3)(A); failure to achieve personal rehabilitation, § 17a-112(c)(3)(B); and no ongoing past child relationship. § 17a-112(c)(3)(D). DCF also claims the mother, by acts of comission or omission, had denied the child the care, guidance or control necessary for his well-being. § 17a-112(c)(3)(C).
The petition to terminate is granted. Consequently, the motion to revoke is moot and is denied.
 I.
A condition to any termination proceeding is clear and convincing evidence that DCF has made reasonable efforts to reunify the child with the parents unless this court finds in this proceeding that a parent is unable or unwilling to benefit from reunification efforts. That finding may be excused by a § 46b-129(k) finding that such efforts are not appropriates
Although the § 46b-129(k) finding followed the filing of CT Page 16797 this petition, the finding proceeded trial. Bypassing any issue of sequence, the court finds by clear and convincing evidence in this proceeding that the parents were unable or unwilling to benefit from reunification efforts and that reasonable reunification efforts were made by DCF until the § 46b-129k finding.
 II.
William, also known as Beau, attended kindergarten and first grade in Middletown, Connecticut. He then attended school in North Carolina from September, 1996 until January, 1997 when he returned to Connecticut and attended school in East Haddam. While in North Carolina, on November 9, 1996 he was diagnosed with Attention Deficit-Hyperactivity Disorder, combined type — severe; oppositional — defiant disorder; and intermittent explosive disorder. From August 9, 1997 until September 24, 1997, in DCF custody, William passed through three DCF foster homes: one was the initial emergency few day placement. He was removed because of his oppositional behavior.
In September, 1997, the youngster was placed with his aunt and uncle, a licensed relative foster home. Despite numerous services, he exhibited self injurious behaviors such as hitting himself, head banging and efforts to pull his finger out of joint. Between August, 1997 and March, 1998, mother/child visits were generally positive.
An Elmcrest evaluation on January 26, 1998 reported depressive disorder. ADHD by history, disruptive behavior disorder and traumatic childhood. William was ready for release from Elmcrest after seven days; the boy was rejected by twenty foster homes. He began to deteriorate when his mother returned in February, 1998. To prevent injury, he was placed at Elmcrest Hospital from February 13, 1998 to June 22, 1998.
The mother left for North Carolina in March, 1998 while he was a patient at Elmcrest. She returned to Connecticut but left again without telling William creating a sense of abandonment for him and denying him the care necessary for his emotional well-being. At Elmcrest, William was aggressive and suicidal. His mother made some visits and had phone contact. Despite staff's request to her not to discuss with William the death of his uncle by gunfire, she did so. This example of self absorption created assaultive and aggressive behavior in the boy requiring CT Page 16798 restraint. He even attempted to run away. The child was already deeply upset because his mother with his siblings had left for North Carolina without notice. She again denied him the care necessary for emotional well-being.
Elmcrest had no contact with father.
The discharge summary dated July 23, 1998 listed Disruptive Behavior Disorder, ADHD. Depressive Disorder and early trauma.
Upon release from Elmcrest, he was placed by Institute for Professional Practice (IPP) which provides highly specialized foster care such as frequent home visits, family counseling, various in-home services, respite and behavior modification program. IPP homes receive addition stipends and training. William is now in his second IPP home. Although William improved considerably at his Meriden school, at Middletown in fall of 1998, he was defiant, assaultive, pulled false fire alarms, refused to do school work and was disruptive. He has been in five different schools and 6 DCF placements.
On November 4, 1998, a Middlesex Mental Health Clinic diagnosed William with Dysthymia Childhood Onset (provisional); oppositional defiant disorder, mild; and history of neglect and abandonment, multiple placement.
According to a North Carolina Department of Social Services November 3, 1998 interstate home study, the agency had and extremely lengthy history with the family since July, 1996. Complaints range from neglect to emotional physical abuse. Siblings have been in regular counseling. The mother completed a parenting class. The parents believe that most of William's problems arose from his foster care moves and his experiences in group facilities in Connecticut. The North Carolina authority recommended residential care. At the end of the home study process, the mother proposed adoption if her son was doing well in a foster home. Exhibit S-10. The parents subsequently returned to Connecticut.
Apart from any North Carolina services, pursuant to the Specific Steps and service agreement DCF provided the following reasonable services to the parents: DCF case management including visitation and referrals to service agencies; Intensive Family Preservation by Child and Family Agency of Southeastern Connecticut, Inc., November, 1995 to January, 1996 — prematurely CT Page 16799 terminated by parents; Community Health Center for maternal counseling and parent aide 1995-1996; The Connection Incorporation for parental substance abuse, January 1996 — mother refused to complete; The Connection Incorporated for sexual abuse evaluation of William, 1996 — mother refused; priority care to assist mother with out of control children, 1996 — mother refused; Community Health Center, parent aide twice but closed upon mothers return to North Carolina; New Horizon Shelter for domestic violence — stayed one week, 1997; Covenant House Shelter, 1997 — failed to attend; and Connecticut Health Center parent aide program, 1998 — failed to enroll. The mother did attend family therapy at Elmcrest in February/March, 1998. There has been little, if any, parental cooperation in Connecticut; none by the father since August, 1997.
The mother has spent considerable periods in North Carolina, while the father remained there because of a Connecticut arrest warrant. The movement was as follows: June, 1996 — all in North Carolina; January, 1997 — William in Connecticut; August, 1997 — mother in Connecticut; September 23, 1997 — mother in North Carolina; October, 1997 — mother back in Connecticut; November 2, 1997, she returned to North Carolina: February, 1998 — back in Connecticut; March 28 in North Carolina; April 11, 1998 in Connecticut; May 5, 1998 — return to North Carolina. December, 1998 — Christmas gifts left at DCF office. The absence of the parents for services had a negative effect on William.
In connection with the prior commitment, Dr. Barbara Berkowitz, on September 29, 1997, conducted a court ordered evaluation. The mother failed to appear as she abruptly left Connecticut the night prior to her appointment. The psychologist concluded that William showed no attachment or happiness or any positive feelings about his mother. His parental figures were neglectful, distant and potentially dangerous. Dr. Berkowitz suggested an updated evaluation within 15-18 months to assess the parents' behavior and Williams progress. Exhibit S-6.
The follow-up evaluation was done on August 31, 1999. Exhibit S-7. The evaluator reported that the mother visited William four times in July and August, 1999; the father joined her in two. The mother is due to deliver her sixth child in February, 2000.
The foster mother, licensed and trained, reported little change in William. Worse, he is a risk to younger children so she has requested his removal from her home when a suitable CT Page 16800 therapeutic placement can be found. The new placement should not include any younger children. Billy is excited prior to family visits. The foster mother warned about possible rage by William if termination were granted; William expects reunification. Exhibit S-7, p. 7-8.
The mother has unorthodox ideas on child raising. She blamed the foster homes for mistreatment and denied any role in her son's difficulties. Because she envisioned herself without problems, she had little motivation to undergo any long term intensive personal treatment. She can misrepresent reality. If termination is granted, the parents would return to North Carolina and return to Connecticut when William was 16 in order to reunite the family. If William were returned to her, she would relocate to North Carolina where she prophesied everything would be fine with some help in readjustment from a family preservation service: she wanted nothing more to do with child therapists. She described her son as a normal healthy child, loving and caring and dismissed the seriousness of his problem: family love was her remedy. Because the mother envisioned happy but unrealistic resolution of her sons problem, the evaluator doubted that the mother would seek any professional help or even cooperate, so problems would continue to rise in the future.
At the psychological evaluation, the father confirmed that William had been a problem child without maternal discipline. Although the father loves his son, the father suggested placement with supervision and treatment. The father was concerned about his son's fire-setting and proclivity to hurt younger children.
Dr. Berkowitz described William as seriously disturbed and in need of long-term psychological and psychopharmacological treatment. The most appropriate placement would be in the care of highly trained specialized foster parents assisted by therapists. His current behavior without treatment could result in a harmful adult without remorse. Dr. Berkowitz concluded that the possibility of return to parent would clearly not be helpful to him.
Given the family background, Dr. Berkowitz saw no likelihood that the parents could meet their son's needs now or in the relatively near future. While she recommends that parental rights be terminated to facilitate the child's attachment to a therapeutic foster home or adoption, the boy will be a significant challenge in any setting, however, experienced or CT Page 16801 trained. She acknowledges that termination will be painful to the parents and William as William has some positive feelings. William may still grow up to be a serious danger in the community. Psychological evidence from professionals is accorded great weight. In re Kezia M., 33 Conn. App. 12, 22, cert. denied,228 Conn. 915 (1993).
The mother testified the family has returned permanently to Connecticut.
In the summer of 1998 mail contact was initiated between mother and son. The son refused subsequent arrangements for phone contact. In July, 1999, face to face contact was resumed after consultation with child's therapist and court ordered visitation has continued after this petition was filed.
While she had no physical contact with Billy from June, 1997 (Elmcrest) until the court visitation order of July, 1999, she believes contact has gone well. She promises all the care and attention he needs. Because of his special needs, she has signed up for parenting and psychology classes. While she concedes that specialized foster care may be better, she suggests mother's love and caring attention plus services can balance the scales. She presents the family as a vital resource. The Community Health Center parent aide reported that they confer about William's siblings and their temper tantrums and general behavior. The aide was not sure if the parent could successfully manage William. The aide has never met William or reviewed his history and concedes she has no basis to know what is best for William. The mother however is in denial that her son is violent and a danger to younger children. She denies any responsibility for William's condition. The mother did agree to cooperate with transfer upon any termination. At this time she is not asking for immediate revocation of his commitment.
 III.a
The court does not find by clear and convincing evidence as of the date of the petition that (1) the child has been abandoned by the mother in the statutory sense that she has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. §17a-112(c)(2)(A). In re John G., 56 Conn. App. 12, 20-21 (1999);
In re Kezia M., 33 Conn. App. 12 (1993); and (2) there is no CT Page 16802 ongoing parent-child relationship between child and parents. § 17a-112(c)(2)(D). In re Jessica M., 217 Conn. 459 (1991).
 III.b
The court does find by clear and convincing evidence as of the date of the petition that (1) the child has been abandoned by the father in the statutory sense that he has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the, child. § 17a-112(c)(2)(A); (2) these parents of a child who has been found to be neglected and uncared for in a prior proceeding have failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child they could assume a responsible position in the life of the child. § 17a-112(c)(2)(B)(1). In re Hector L., 53 Conn. App. 359,366-367 (1999); In re Shyliesh H., 56 Conn. App. 167, 173 (1999); and (3) the mother had denied William, by reason of an act or acts of parental comission or omission the care, guidance or control necessary for his physical, educational, moral or emotional well-being. § 17a-112(c)(2)(C). In re Sean H.,24 Conn. App. 135 (1991); In re Kelly S., 29 Conn. App. 600 (1992).
 IV.a
Having found statutory grounds for termination, the court must consider and make seven written findings as part of the disposition as of the last hearing date when the emphasis shifts to the best interest of the child who needs a sense of permanency.
In addition to the facts previously found, the court makes these additional findings on clear and convincing evidence:
1. Considering the availability of the parents, the services offered, provided and made available were timely, appropriate and extensive as provided by DCF to facilitate the reunification of the child with the parents.
2. The efforts by DCF were reasonable to reunite the family pursuant to the Adoption Assistance and Child Welfare Act of 1980 as amended.
3. The court ordered Specific Steps and Expectations, and the mother signed three Service Agreements with DCF, all of which CT Page 16803 documents are part of the court record. Under the Specific Steps the parents were to visit the child, participate in counseling, substance abuse assessment and treatment, cooperate with home support services, and address sexual abuse concerns with William. The Expectations indicated the parents were to keep all appointments set by DCF, visit the child, individual domestic violence evaluations and recommended treatment for drug/alcohol abuse, adequate housing and income, no substance abuse and accept parent aide or Family Preservation Services. The Service Agreement Exhibit S-1 covered establishing stable housing and income in Connecticut, substance abuse evaluation and follow-up William counseling for fire setting and sexual behavior, domestic violence individual/group counseling, and cooperation with Intensive Family Preservation/parent aide. The other two Service Agreement cover the other children of the family but do relate to general discipline rules which could be applicable to William. There has been no significant compliance with these documents.
4. The child has some feelings and emotional ties to his parents and also to his foster family.
5. The child is 10 years old.
6. Neither parent has made significant efforts to adjust their circumstances, conduct or conditions to make it in the best interest of William to return him to his home in the foreseeable future. There has not been sustained contact despite some incidental phone calls and recent visits. The father has isolated himself in North Carolina and the mother does not recognize any problem necessitating any personal change.
7. No one has prevented the parents from maintaining a meaningful relationship with the child by unreasonable act or conduct or by economic circumstances of the parent.
 IV.b
William's age and the depth and nature of his behavior do present permanency problems. While his own family has not been a positive force in his rehabilitation, there is no guarantee that an alternative will produce a well adjusted person. But there are few guarantees in life.
William has not improved and may be more seriously disturbed. Dr. Berkowitz testified that even if adoption where not possible CT Page 16804 she would still recommend termination. She saw no real hope for reunification with either natural parent. Adoption is not necessarily the goal of termination. In re Rebecca W.,8 Conn. App. 92 (1986). Termination would represent a chance at adoption into a more appropriate setting. A long time therapeutic foster home after termination is second best to adoption. Because the boy must be moved now, DCF would have the inducement of adoption in order to obtain the most appropriate foster home. Without permanency and treatment, William could be so seriously disturbed to be a physical risk to others. Termination is in William's best interest, however problematic and uncertain the ultimate recovery.
Accordingly, the petition to terminate parental rights to William is granted. The Commissioner of DCF is appointed statutory parent. A care plan shall be filed within sixty days from judgment and a hearing for review of the plan shall be held within twelve months from judgment. Treatment Plan/Administrative Reviews shall be filed in the current sequence.
The motion to revoke is denied as moot. Even if it were not, the motion would be denied on the merits. C. P. B. § 33-10.
SAMUEL S. GOLDSTEIN, JUDGE TRIAL REFEREE