MEMORANDUM OF DECISION
On May 23, 2000, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Brandy D., a.k.a. Brandy S. and Gerald C. to their son Gerald.[2] Both parents were personally served with the petition for termination and both parents had counsel appointed to represent them.[3] The court has jurisdiction in this matter and there is no pending action affecting custody of the child in any other court. The grounds alleged for the termination of parental rights petition for the respondent mother are abandonment, failure to rehabilitate, no ongoing parent child relationship, and a prior termination of parental rights of another child. The grounds alleged for the termination of respondent father's parental rights are abandonment, failure to rehabilitate and no ongoing parent child relationship. The termination trial commenced and concluded on November 16, 2000.
Gerald was born on October 24, 1997. In November of 1998 DCF filed neglect petitions on behalf of Gerald. On May 4, 1999 the child was adjudicated neglected and committed to DCF for a period of twelve months.[4] Said commitment was extended for an additional twelve months in May 2000. The initial allegations surrounding the commitment were that respondent mother had abandoned the child. Respondent father had called DCF to indicate he could no longer care for his infant son.
TERMINATION ADJUDICATION
In order to terminate parental rights, DCF must have "made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. General Statutes § 17a-112 (c)(1).
DCF made reasonable efforts to locate the respondent parents. Both respondent parents were in and out of the correctional system. There was credible evidence that DCF made inquiries to see if the respondent father was in jail. Respondent mother was given specific steps and offers of referrals by DCF.
The court, in granting DCF's motion to extend the commitment to May of CT Page 14974 2001, deferred any ruling on whether continuing efforts to reunify were still appropriate and also deferred approving any permanency plan. DCF had disclosed that it planned to pursue termination but had not yet filed any petitions. Respondent mother, according to the court record of February 2, 2000, was to work on reunification while DCF was preparing to file termination petitions. DCF testified at the termination trial that they continued to make reasonable efforts to reunify the parents with the child.
DCF offered the respondent mother substance abuse evaluations.[5] She tested positive for cocaine but never returned for an evaluation. Repeated offers for a substance abuse evaluation were made. A referral was made to Coordinating Counsel for Children in Crisis. Respondent mother failed to follow through in that she was not consistent in keeping her appointments with the parent aide in the home. Tokens for transportation were offered to the respondent mother both for substance abuse evaluations and for visitation with her child. Visits were offered twice a month with the requirement that respondent mother call one day in advance to confirm the visit. The evidence reflects that mother had only two visits with the child Gerald in 1999 and two visits in 2000, the last being in April of 2000.[6] During the last few visits the child refused to go to the mother, he clung to the social worker and screamed and cried for half the visit.
Court ordered psychological evaluations were scheduled for both respondent parents and the child. Respondent mother failed to appear for a psychological evaluation on three separate occasions even though DCF reminded respondent mother of the scheduled appointments.[7] Court ordered specific steps were signed on May 4, 1999. There was virtually no compliance with the court ordered steps by respondent mother.
Respondent father was also offered substance abuse evaluations. Prior to the child's removal from the father's care in November of 1998, DCF attempted to offer the father services. He refused saying that he was not residing with the respondent mother and therefore not part of the case. DCF determined that he was in fact residing with the respondent mother. Almost simultaneously with the removal of the child from the father's care the respondent father was incarcerated. He was in and out of jail throughout November of 1998 until January 14, 1999. Respondent father was offered visits twice a month with the condition that he call ahead to schedule and then call the day before to confirm the visit. DCF did facilitate two visits between the child and father. One occurred at the jail in November of 1998. The visit went well. The second visit occurred in February of 1999 at the DCF office. Subsequently in May of 1999 the respondent father was incarcerated in a correctional facility which would only allow "no contact" visits. Therefore only telephone visits with CT Page 14975 visual contact through glass were permitted. The child's age made it impossible to conduct a telephone visit. DCF testified that the respondent father did attend and successfully complete the NA and AA programs offered at the prison. There were no parenting classes offered at the Walker Correctional facility where the respondent father was incarcerated. Respondent father's expected release from prison is October 2002.
Respondent father did attend the court ordered psychological evaluation in May of 1999.[8] Mr. C. was appropriate with the child, Gerald. Respondent father tested as having average intelligence and a generally healthy personality. The evaluator also noted that Mr. C. "seemed undisciplined, impulsive and unable to maintain a stable, independent life as an adult."
The court finds that DCF made reasonable efforts to reunify the respondent parents with their son, Gerald. Services were offered to both parents and were refused by both parents.
STATUTORY GROUNDS
DCF alleges four statutory grounds on which they base their petition to terminate the parental rights of respondent mother. They allege three statutory grounds as to respondent father. The court finds by clear and convincing evidence the following:
Abandonment
General Statutes § 17a-112 (c)(3)(A) provides that a ground for termination exits when "(t)he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In re MigdaliaM. 6 Conn. App. 194, 208-09, cert. denied, 199 Conn. 809 (1986). If a parent fails to visit a child and lacks any real interaction with the child and shows no concern for the child's welfare then statutory abandonment exists. Id. at 209.
Respondent mother became whereabouts unknown to DCF on October 29, 1998. She had suddenly vacated the residence where she was staying, leaving the child with the respondent father. Shortly thereafter mother told DCF she was homeless. The child was removed from the respondent father's care in November of 1998. Since the date of the child's removal respondent mother has had only four visits with the child. Respondent CT Page 14976 mother's friend delivered two gifts for the child, Gerald, in December of 1999. Respondent mother missed three scheduled psychological evaluations, even after being reminded of them. There have been no further cards, gifts or financial support received by the child from the mother. Four visits in two years, in a three year old's life, with no evidence of any other contact or expression of concern, is overwhelming evidence of abandonment.
Respondent father had one visit while in jail in November of 1998. He had another visit in February of 1999 at the DCF office. Evidence reflects that the respondent father was not reincarcerated until May 20, 1999[9] For the approximately five months that the respondent father was not incarcerated there were no other visits or inquiries about the child by the respondent father. Subsequent substantive visits were impossible due to the father's re-incarceration and the correctional facility's mandate of only "no contact" visits. There was evidence presented at trial that after January of 2000 contact visits had been permitted.[10]
It is conceded that "a parent's incarceration by itself does not constitute abandonment." In re Roshawn R. 51 Conn. App. 44, 53 (1998). It is equally true, however, that in determining whether there is clear and convincing evidence of the statutory ground of abandonment, the number of visits between the parent and the child is not the sole criteria to be relied on. Abandonment focuses on the parent's conduct. Id. at 52. The record reflects that when incarcerated Mr. C maintains a visitation schedule; something that did not occur when he was not incarcerated. While incarcerated Mr. C successfully engaged in substance abuse programs; something he refused to do when DCF offered services. "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child: (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Citations omitted; internal quotation marks omitted.). In re Kezia M.33 Conn. App. 12, 17-18, 683 A.2d 1122 (1993)." Id. at 53. It is clear that Mr. C does have the ability to have a positive visit with his son. He does express love and affection for the child during the visits. However, since the child's removal from his care in November of 1998 Mr. C has failed to make any attempt to supply the child with the necessities of life, such as food, shelter, clothing or supervision. There were no cards, gifts or other tokens of concern. Based on the choices that Mr. C made for himself he has become nothing more than a stranger or a distance relative who visits with the child, Gerald. Respondent father has failed to maintain or sustain a continuing, reasonable degree of concern for CT Page 14977 Gerald. In re Migdalia M. at 210. The ground of abandonment has been proven by clear and convincing evidence.
Failure to Rehabilitate § 17a-112 (B)(2)
"[T]he parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs ofthe child, such parent could assume a responsible position in the life of the child . . ." (Emphasis added.) General States (Rev. To 1995) §17a-112 (b)(2). "`Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." [citation omitted]. "Our Supreme Court has held that § [17a-112] (b)(2) requires the trial court to analyze the respondent's rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time . . ."
(Citations omitted; internal quotation marks omitted.) In re Roshawn R.
at 54-54.
Respondent mother abruptly left her child with respondent father in November of 1998. Respondent mother has a chronic substance abuse problem. There was no evidence that she has ever effectively dealt with her abuse issues. Her release from prison to the Morris Foundation proved unsuccessful in that she was returned to prison for failure to comply with the program rules. She failed to follow through with any of the services offered by DCF. She failed to appear for three psychological evaluations. She failed to maintain a visitation schedule. Respondent mother's transient lifestyle in late 1998 appears to continue into 2000. It is unlikely that respondent mother will ever rehabilitate herself. She certainly has not achieved any degree of rehabilitation to become a viable parent to a three year old boy.
Mr. C has successfully completed the substance abuse programs available to him in prison.[11] His successful completion of programs in prison does not mean that it is foreseeable within a reasonable period of time that he will be a viable parent to Gerald. Gerald needs a father who is not in prison, who can maintain employment, secure stable housing, remain drug free and be a consistent care giver to a three year old. Gerald has been in foster care since November of 1998, approximately two thirds of his life, waiting for a parent to achieve those goals. No further amount of time is reasonable for Gerald to have to wait to see if Mr. may at some unknown future date be able to do the things necessary for him to be a father to Gerald. CT Page 14978
No ongoing Parent/Child Relationship
In determining whether there is any ongoing parent/child relationship within the meaning of § 17a-112 (c) 112(c)(3)(D) the court must engage in a two prong analysis. First it must be determined "(t)hat no parent/child relationship exists, and, second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop." (Citation omitted) In re Savanna M. 55 Conn. App. 807, 815 (1999).
There is no ongoing parent/child relationship between respondent mother and child. Given the child's age and lack of contact with the mother it is not surprising that the only reaction the child did have at the last few visits was one of extreme crying and screaming. It is clearly detrimental to what is best for Gerald to allow more time to pass so that in the highly unlikely event that respondent mother rehabilitates she might be amenable to developing a parent/child relationship.
The relationship that exists between respondent father and Gerald is not one of a parent/child. It is one of a adult male stranger or a distant relative who has a supervised visit at a correctional facility with a now three year old boy. Whether there ever was a parent/child relationship between father and son is difficult to determine, given the young age at which Gerald was removed from his father's care and the lengthy time Gerald has remained in foster care . . . It is clear that if there had been a father/son relationship it has been displaced. The on going parent/child relationship that Gerald is now involved in centers around his foster parents. The issue becomes whether it would be in Gerald's best interest to allow time for him and his biological father to develop or redevelop a parent/child relationship. Given the age of the child, and the amount of time Gerald has remained in foster care, his close bond to his foster parents and the uncertainty as to when Mr. C would be able to have more than a once a month visit in prison with Gerald, dictates that it would be detrimental for Gerald to wait any longer in the limbo he has resided in for two years.
Prior Termination of the Parental Rights of a Sibling
 17a-112 (c)(E) allows DCF to seek termination of the parental rights when: "(T)he parent of a child under the age of seven years who is neglected or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child CT Page 14979 were previously terminated pursuant to a petition filed by the Commissioner of Children and Families."
There was undisputed evidence presented at trial that respondent mother's parental rights as to Malik S. were terminated on May 5, 1999.[12] The child, Gerald, is under the age of seven years and has been adjudicated neglected. Respondent mother has failed to achieve personal rehabilitation within a reasonable period of time as to assume a responsible position in Gerald's life. There is clear and convincing as to the statutory ground outlined in § 17a-112(c)(E) as to respondent mother.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven that `termination is in the best interest of the child.' § 17a-112(c)(2). The court may consider all events occurring through the close of the dispositional hearing.
It is in Gerald's best interest, by clear and convincing evidence, to terminate the parental rights of the respondent mother and father.
The court, in arriving at the decision to terminate parental rights must consider and make written findings regarding the seven factors set forth in § 17a-112 (e).
(1) This court must look at the timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent. As is evident in the preceding part of this opinion there were efforts put forth to provide both parents with services to address their substance abuse issues and inability to parent Gerald. The parents lack of willingness or ability to address their substance abuse issues and accept services offered by DCF resulted in a transient, unstable lifestyle.
(2) DCF made reasonable efforts to reunite the child with his parents pursuant to the federal Adoption Assistance and Child Welfare Act of 1980. For the reasons set forth previously, the court finds that DCF offered appropriate services to both respondent parents in an attempt to reunify the child with parents.
(3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such an order must be addressed. Respondent mother's compliance with the court ordered specific steps was virtually nonexistent. She never received successful substance CT Page 14980 abuse treatment, she never maintained a consistent visitation schedule, she did not consistently keep her whereabouts known to DCF, she missed repeated appointments for a psychological evaluation, and she did not stay uninvolved in the criminal justice system. DCF did offer services, both for respondent mother's substance abuse issues, for parenting issues, tokens for transportation, and supervised visitation. Respondent mother did not accept DCF services.
Respondent father became compliant with services offered only after he was incarcerated in May of 1999. He refused a substance abuse evaluation in 1998 and did not keep a consistent visitation schedule prior to his 1999 re-incarceration.
(4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties must be discussed.
Gerald is very bonded to his foster parents. His sudden removal from his present foster home in April of 2000 was very traumatic for the child. Gerald was described as a lost child until he was returned to his foster home in July of 2000. The social worker testified that she has been doing monthly visits with the child for two years. Every time Gerald sees the social worker he runs from her and begins to cry. The foster parents are willing to adopt Gerald.
Gerald has no significant ties to his biological parents. Given his age and lack of contact between respondent mother and Gerald over the last two years the child has no positive emotional tie with his biological mother.
According to Dr. Freedman, the psychologist who conducted the court ordered evaluations, the relationship between Gerald and the respondent father was that of a young child with a stranger or a distant relative.
(5) Gerald is now three years old. He has spent approximately two thirds of his life in foster care. He deserves to leave foster care and to attain permanency in adoption.[13]
(6) Neither respondent parent have made efforts to adjust their circumstances, conduct or condition to make it in the best interest of Gerald to return him to either respondent parent in the foreseeable future. Respondent mother has made no attempt to have any contact with Gerald since 1999. She contacted DCF in October of 2000, one month prior to the termination trial, but was not available for further follow up. CT Page 14981 She failed to appear at the termination trial.
To his credit, respondent father did complete available prison programs. His continued incarceration makes anything other than prison visits impossible. Other than the monthly visits when DCF brings the child to the prison, respondent father initiates no other contact or offers any other support, emotional or financial, to the child.
(7) Failure of either respondent parent to successfully reunite with their child is due solely to the choices and behaviors that each of the respondent parents decided to engage in. This court is aware of no individual or agency, or economic restraints that prohibited either respondent parent to reunify with the child.
CONCLUSION
This court finds by clear and convincing evidence that it is in Gerald's best interest to terminate the parental rights of the respondent parents. This conclusion is reached only after considering the child's needs, the length of time he has been in foster care and his need for permanency, which in this case means adoption.
Accordingly, the court hereby grants the termination petitions as to Gerald S. The court orders that the Commissioner of the Department of Children and Families be appointed the statutory parent for Gerald S. A permanency plan shall be filed with the court within thirty days. A review plan will be filed in accordance with state and federal law.
Bernadette Conway, Judge