MEMORANDUM OF DECISION
On April 17, 2000, the Department of Children and Families (DCF) brought this petition to terminate the parental rights of Azalia L. (also known as Azalia T.). and Michael H. to their daughter Zaire. DCF took custody of Zaire two days after her birth, and she has remained in the same foster home where DCF placed her since then. The petitioner alleges that each parent has (a) abandoned Zaire and (b) failed to rehabilitate themselves, within the statutory meaning of the term, to be able to assume a responsible position in Zaire's life. In addition, the court has CT Page 3797 granted a motion of the maternal grandmother, Denise T., to intervene for dispositional purposes; she opposes termination of the respondent mother's parental rights and seeks transfer of guardianship to herself. For the reasons stated below, the court finds both matters in favor of the petitioner and that it is in Zaire's best interest to terminate the respondents' parental rights.
The trial of this case occurred on October 12 and 13 and November 2, 2000. The respondent father and the maternal grandmother both appeared personally and with counsel. The petitioner and the minor child were represented by their respective counsel throughout the proceeding. The petitioner called as its witnesses the DCF social worker, a DCF case aide, and the minor child's foster mother, and introduced numerous exhibits into evidence. The respondent father testified himself, called his counselor at the correctional institution where he was incarcerated at the time of trial as a witness, and offered several documentary exhibits into evidence. The intervener also testified.
The court finds that the Child Protection Session of the Superior Court for Juvenile Matters has jurisdiction over the pending matter. The court finds that both parents were served with the petitions.[2] No action is pending in any other court affecting custody of the child.
 I — FACTUAL FINDINGS
The court has carefully considered the verified petition, the testimony presented, and all of the exhibits, including the social study, entered into evidence, according to the standards required by law.[3] Upon such consideration, the court makes the following factual findings:
A. PROCEDURAL HISTORY
Zaire was born on March 1999. Her mother was then incarcerated pre-trial on pending charges of possession of narcotics and three counts of risk in injury. Her was also detained on a pretrial basis, having been arrested in January 1999 for three counts each of possession of narcotics and illegal sale of hallucinogenic or narcotic substances. (Pet. Ex. 6). When DCF realized that the mother would be released on bond, the department placed a 96-hour hold on Zaire on March 10, 1999, because it was concerned about potential danger her drug-related lifestyle might pose to an infant, and then two days later obtained an ex parte Order of Temporary Custody. DCF placed Zaire in a foster home where she has remained to the present. On March 22, 1999, the court, Ward, J., sustained the OTC; that same day, Mr. H. also signed a formal written acknowledgment of paternity (Respondent's Exhibit B.) On May 5, 1999, the court, Ward, J., adjudicated Zaire to be neglected and committed her to CT Page 3798 DCF. The court also entered orders of Specific Steps for both parents to comply with to gain custody of Zaire.[4]
On February 14, 2000, the court, Santos, J., found that the department had made reasonable efforts to reunify Zaire with the respondents, and further found that continuing such efforts were no longer appropriate as to either respondent. (Testimony of L. Torres.) The court takes judicial notice of the contents of its own file, and finds that the respondent father and his attorney were present in court that day, that the respondent mother was absent, and that her attorney was present.
B. THE RESPONDENT MOTHER
On June 10, 1999, one month after the neglect adjudication, the respondent mother was convicted of a substituted charge of illegal sale of hallucinogenic substances, in violation of § 21a-277 (a), and sentenced to a term of six years suspended after one year, three years probation. (Pet. Ex. 5.) After she was released from incarceration in November 1999, she contacted DCF twice inquiring about visitation with Zaire (Pet. Ex. 1 at 8), but since January 2000 neither the department nor the court has heard from her or had any contact with her. DCF sent letters to her at her last known address and called her there. (Pet. Ex. 1 at 4.) The department tried to find her by contacting her mother, her older siblings, and the paternal grandmother. The department inquired about her at the Department of Social Services, the Department of Corrections, and telephone information trying to find her, all to no avail. (Testimony of L. Torres.)
C. THE RESPONDENT FATHER
Michael H. is a 31-year-old man born of parents who both had alcohol problems. He started experimenting with drugs in high school, and has used marijuana, cocaine, and alcohol. He told the DCF social worker that he used marijuana daily and that his drug of choice is crack cocaine. He was expelled from high school in twelfth grade because of a fight with another student. For most of his life, he has never held a job for more than a couple of months. (Pet. Ex. 1 at 5.)
Mr. H. is the father of four other children, three girls and a boy, ages twelve, eleven, nine, and one, by three other mothers. When asked by the assistant attorney general at trial how much he had contributed to the support of his children in 1998, Mr. H. claimed he could not say. (Testimony of Michael H.) He claimed he did not even know his total 1998 income because he was addicted to drugs at the time; but he admitted he was selling narcotics to support his habit. (Id.) From this fact the court infers that he had sufficient income that would have enabled him, CT Page 3799 had he wanted to, to contribute significantly to the support of these children. The court infers from his professed inability to estimate the amount of financial support he provided these children in 1998 that he gave them little or none.
In the last decade Mr. H. developed an extensive criminal record characterized by increasingly serious offenses, committing new offenses while on bond or probation, failing to show up for court appearances, and escalating response from prosecuting authorities and the courts.[5] By the time of trial here, Mr. H. had been convicted of four counts of failure to appear, two violations of probation, four counts of sales of hallucinogenic substances / marijuana, and possession of marijuana.
At the court hearing for the OTC, Mr. H. met with Loisa Torres, the DCF social worker assigned to this case, and asked to start seeing his daughter. Ms. Torres told him that would not be a problem and suggested weekly visits at the DCF office. Since she wanted to meet with him to begin preparing a social study, they scheduled a meeting on March 26 (Pet. Ex. 8) for both purposes. Mr. H. did not show up for that meeting, however, nor call DCF to cancel it or call later to explain his absence. Between that missed appointment and April 14, she did not hear from him. (Testimony of L. Torres.)
On April 14, Ms. Torres reached Mr. H. by telephone at his mother's home and asked him why he had missed his appointment. He told her he had been busy and had to address his substance abuse issues. (Testimony of L. Torres.) He repeated his desire to see his daughter and said he was looking for a family member to take care of the child. (Pet. Ex. 1 at 5.) Mr. H. told Ms. Torres he was not seeking to be Zaire's primary caretaker (Pet. Ex. 8), was not then able to care for the child, but he wanted his family to do so to prevent her being bounced around in foster care. (Id; testimony of L. Torres.)
Mr. H. asked Ms. Torres for the department to approve either his mother or his sister Holly to care for Zaire. (Testimony of L. Torres and Michael H.) On either this or a later occasion, he also asked that the department consider a female cousin named Cheryl and two other female friends as potential caretakers of Zaire. (Testimony of L. Torres.) The department did not consider either the sister or cousin to be appropriate foster placements for Zaire because their own arrests for risk of injury and possession of narcotics preclude them, under DCF policy, from being a foster placement. The paternal grandmother at first volunteered to be considered a relative foster care placement but later changed her mind. The department did not seriously consider placements with the other two women; while the department will actively consider relative foster placements, neither one was a relative. (Testimony of L. Torres) CT Page 3800
Although the DCF social worker had scheduled weekly visits for Mr. H. beginning the week after the neglect adjudication on May 5, Mr. H. missed all the visits scheduled in May and June. (Test. of L. Torres.) Ms. Torres tried numerous times to reach him by calling him (Pet. Ex. 1 at 10) at his girlfriend's house. She left messages with a female whom she spoke to there and on an answering machine, and she also called his mother; but she never heard back from him. (Testimony of L. Torres.) Mr. H. never called DCF, sent DCF any messages, either directly or through others, or wrote the department. (Id.) The DCF social worker then sent him a letter on June 23, 1999, notifying him that the department was canceling his visits with Zaire due to his no shows, and informing him of his right to request a "treatment plan hearing," presumably to contest that decision. (Pet. Ex. 4.) The department did not hear from him again and had no more contact with or from Mr. H. during the remainder of 1999.
Although not complying with the court's order to keep in contact with DCF, to keep DCF aware of his whereabouts, and to visit Zaire as often as possible, Mr. H. was taking other steps to improve his life. He started classes in HVAC. He also was involved in a substance abuse treatment program between March and September 1999. Records submitted to the court as exhibits from the petitioner and the respondent show that during this period he participated in substance abuse programs offered by the Wheeler Clinic. He first completed an intensive evening treatment program that met three evenings a week for a minimum of twelve four-hour sessions between March 25 and May 6. Although drug testing showed positive results for THC on March 30 and April 30, the program staff regarded him as having made satisfactory progress in that phase of the program by accepting his addiction. He was then referred to a relapse and recovery group day group program, but was later transferred back to evening groups because the day program conflicted with his work schedule. (Resp. Ex. D.)
During this second phase of the Wheeler program, he missed seven sessions and showed up once intoxicated, claiming he did not realize he could not use alcohol during the treatment program. His counselor commented on his September 14 discharge sheet that this remark was "already the beginning of denial and rationalization to himself." Still, despite that negative comment, the missed sessions, and the two positive drug tests, the discharge assessment form from Wheeler Clinic noted "successful or partially successful treatment (moderate or better improvement)." The clinic's discharge summary sheet rated Mr. H. as having made "good progress (60-80%)" on his goals of substance avoidance during his treatment. This ranking was the second highest of five progress levels on the discharge sheet. The discharge summary also noted CT Page 3801 "fair prognosis (based on use during treatment)." (Pet. Ex. 10 24; Resp. Ex. D.)
On September 21, 1999, Mr. H. was convicted on three counts of sale of hallucinogenic substances or narcotics, in violation of general statutes § 21a-277(a). (Pet. Ex. 6.) As his state police record shows these were charges on a substituted information, the court infers that he pleaded guilty as part of a plea bargain. He was sentenced to a term of ten years suspended after three years, with five years probation. (Id.) He began serving his sentence that day. (Testimony of L. Torres.)
Mr. H. did not notify the department that he had been re-incarcerated and the department had no information as to his whereabouts between the May 5 juvenile court proceeding and September 1999. During September or October, the DCF social worker learned from his mother that he had started serving a prison sentence in September. The Department of Corrections informed Ms. Torres that the respondent was at the Cheshire correctional facility, where she wrote him a letter dated December 20, 1999. (Testimony of L. Torres.) That letter, introduced into evidence as Respondent's Exhibit A, stated as follows:
 My understanding is that you have been incarcerated since September 1999. However, you have failed to contact me about visitation or concerns with your daughter since she came into care in March of 1999. Currently you are not working with the Department toward reunification with Zaire. Due to your lack of interest, the Department is force [sic] to consider alternate permanent planning for Zaire.
Please give me a call regarding your child.
In January 2000 the respondent called Ms. Torres in response to the December 1999 letter. He told her he was no longer at Cheshire, but instead at Willard-Cybulski Correctional Institution in Enfield. He requested visits with his daughter at the prison. (Testimony of L. Torres.) From March through October 2000, the department provided him with monthly visits at the prison with Zaire. DCF case aid Yvonne Muniz transported Zaire to and from the visits and supervised them. (Testimony of Y. Muniz.)
Mr. H.'s ultimate release date from Department of Corrections custody is September 2002. (Pet. ex. 1 at 11.) His jail counselor, David Maiga, testified at trial that Mr. H. was eligible for placement at a halfway house as of August 23, 2000, and would be eligible for parole as of February 17, 2001. (Testimony of David Maiga.) The court takes judicial CT Page 3802 notice of the contents of § 54-125a of the general statutes, under which Mr. H. will be eligible to go at large on parole in the discretion of the panel of the Board of Parole after serving fifty per cent of that prison sentence.[6] On October 20, 2000, he was released from prison to a halfway house. After his release, he did not call or write DCF to notify the department of his new whereabouts or to request additional visitation with Zaire. (Testimony of L. Torres.)
While incarcerated since September 1999, Mr. H. was a model prisoner. He participated in the prison's substance abuse program. He was placed in a vocational release program that allowed him to work outside the prison for six hours daily. (Testimony of David Maiga.) He has job offers upon his release from prison. He also plans to conclude his training in HVAC. (Testimony of Michael H.)
The prison offered parental counseling (Pet. Ex. 7), but Mr. H. did not take such counseling. (Testimony of Michael H.)
D. THE CHILD ZAIRE
Zaire was placed with her current foster parents when she was two days old. The foster parents' own two children, age's eight and two and one-half, also live in the household. She was small as a newborn, only five pounds, and has shown signs of fetal alcohol syndrome, but has no apparent developmental delays. She has asthma, and her foster mother has taken her to the emergency room for wheezing three times. (Pet. Ex. 1 at 6; testimony of foster mother.)
A DCF case aide, Yvonne Muniz, drove Zaire to and from the prison for visits with Mr. H. When Ms. went to the foster home to pick up the child, Zaire would begin crying, move away from her, grab onto the foster mother and hold her tightly. Zaire would continue crying during the car ride to the prison. When she saw Mr. H. in the visiting room, she would again begin crying and cling tightly to Ms. Muniz. At some point during the hour-long visit, Zaire would finally stop crying. At that point, she would sometimes interact with Mr. H. by sitting on his lap while he talked to her or showed her toys he had brought for her. In the October visit, she sat at ease on Mr. H.'s lap for the last half hour of the visit. Mr. H. acts appropriately with Zaire during the visits. Never during any of these visits, however, was Zaire been comfortable enough with Mr. H. for her to be left alone with him. Zaire would sleep on the ride home as though she were exhausted. After the visits, Zaire often had wheezing problems, and after the September visit, Zaire had to go to the doctor afterwards because of excessive asthmatic wheezing. (Testimony of Y. Muniz and Michael H.)
CT Page 3803
Zaire is doing very well in the foster home. She has adjusted there well and DCF has concluded that she is thriving in that environment. She appears happy there. The foster parents meet her psychological, developmental and other needs. She calls them "mommy" and "daddy." She is very bonded to her foster family. She has never spoken about, or asked her foster parents about, either her biological mother or biological father. She needs a safe, permanent and stable home, characteristics the foster parents offer. (Testimony of L. Torres; testimony of foster mother; Pet. Ex. 1 at 6, 8, and 10-11.)
 II — ADJUDICATORY DECISION[7]
Trial of a petition to terminate parental rights has two phases, adjudication and disposition. In the adjudicatory phase of the proceeding, the court must make separate determinations as to reasonable efforts and statutory grounds for termination. In a nonconsensual termination of parental rights case, the court must find whether
 • There is clear and convincing evidence that DCF has made reasonable efforts to locate the parent; and
 • There is clear and convincing evidence that DCF has made reasonable efforts to reunify the child with the parent, unless the court finds that the parent is unable or unwilling to benefit from reunification efforts. (A finding as to reasonable reunification efforts is not required, however, if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b that such efforts are not appropriate.)[8]
DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919,722 A.2d 807 (1998); General Statutes § 17a-112 (j)(3)."In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment."In re Tabitha P., 39 Conn. App. 353, 367, 664 A.2d 1168 (1995); Practice Book § 33-3(a). As to the adjudicatory phase of this hearing of the petition for termination of parental rights, the court has considered the evidence and testimony related to circumstances and events following the adjudication of neglect on May 25, 1999, and until April 17, 2000, when the TPR was filed.
CT Page 3804
A. LOCATION AND REUNIFICATION
The petition alleges here that the department tried to locate each parent and to reunite Zaire with each parent, and that reasonable reunification efforts were no longer required because the Superior Court has already held that such efforts were not appropriate. With respect to the statutorily-required elements of location and reunification, the court finds as follows:
1. Reasonable efforts to locate
The court finds by clear and convincing evidence that DCF made reasonable efforts to locate the respondents. The department in fact did locate the respondent father. With only two telephone contacts with the respondent mother after her release from prison in November 1999, and not knowing her whereabouts, DCF took reasonable and appropriate steps to find her by calling and writing her at her last known addresses, trying to contact her through her relatives, and contacting appropriate agencies.
2. Reasonable efforts to reunify
a) This court finds that the Superior Court had previously determined at a court hearing that reasonable efforts to reunify the parents with Zaire were no longer appropriate.
b) This court also finds by clear and convincing evidence that the department made reasonable efforts to reunify Zaire with her father. It offered visits, investigated relative foster placements, and obtained court orders for Mr. H. to address his substance abuse and other problems that might interfere with his parenting. The court finds by clear and convincing evidence that, until her release from prison, DCF had made reasonable efforts to reunify Azalia L. with Zaire by referring her to various services and offering visitation. The court also finds by clear and convincing evidence, in view of the respondent mother's absence and her inability to be found, that after her release from prison, she was unable or unwilling to benefit from reunification efforts.
B. STATUTORY GROUNDS FOR TERMINATION
 1. Adjudicatory date
Under Practice Book section 33-3(a), "[i]n the adjudicatory phase, the judicial authority is limited to events preceding the filing of the petition or the latest amendment." In the present case, the petitioner filed the petition for termination of the respondents' parental rights on CT Page 3805 April 17, 2000. That petition alleged abandonment by each parent but was incomplete as to form in alleging the second adjudicatory ground as to each parent. Although the petitioner checked the boxes for grounds A and B1 on the petition form alleging abandonment (ground A) and failure to rehabilitate (ground B1) on the petition form, it neglected to check boxes on the form specifying against which respondent it was alleging the latter ground, as shown below in in Figure 1, a scanned replica of a portion of the TPR petition:
 [x] A. The child/youth has been abandoned by the [x]mother [x] father in the sense that the parent(s) failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child/youth.
 [x] B1.The child/youth has been found in a prior proceeding to have been neglected or uncared for AND the mother father has/have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child/youth, he/she/they could assume a responsible position in the life of the child/youth, or
Figure 1: Scanned replica from page two of TPR petition.
Taking judicial notice of the contents of the court's own file, the court notes that the "Summary of Adjudicatory Facts for Termination of Parental Rights" filed simultaneously with the TPR petition stated that the department was proceeding against each parent on both abandonment and failure to rehabilitate grounds and recited facts supporting both claimed grounds as to each parent. See Summary of Adjudicatory Facts forTermination of Parental Rights at pp. 4-6.
On August 8, 2000, the court, Shapiro, J., granted the petitioner's motion to amend the petition to mark the failure to rehabilitate ground as to both parents; the motion stated that counsel for the respondents and child had no objection to the amendment. The court noted on its order granting the motion that it did so "absent objection." The motion also stated that "[t]he petitioner requests that the granting of this technical amendment does not change the adjudicatory date," without specifying whether respondents agreed to this request.
Thus, the adjudicatory date is either April 17, 2000, or August 8, 2000. This court is not aware of any appellate cases construing the CT Page 3806 effect of an amendment such as that here. At least one trial court, however, has held that such an amendment is a technical correction not affecting the adjudicatory date. See In the Interest of Pedro G., Superior Court for Juvenile Matters, Child Protection Session (September 27, 2000, Quinn J.). The present amendment was not material in any sense. It changed nothing with regard to the facts on which the petitioner was relying. Each respondent had prior notice that the petitioner was relying on the claim of failure to rehabilitate. Moreover, each party had notice that the petitioner had requested that the amendment not affect the adjudicatory date and did not object to that request. This court concludes, therefore, that the August 8 amendment did not alter the adjudicatory date for two reasons: it was not a material or substantial variance affecting the rights of either respondent; and the respondents waived any claim to the contrary by not objecting to the request. Moreover, the court also concludes that regardless of adjudicatory date, the petitioner has, by clear and convincing evidence, proven abandonment by the mother and both abandonment and failure to rehabilitate by the father.
2. Abandonment — § 17a-112(j)(3)(A)
The petitioner has asserted, as one of the statutory grounds for terminating the parental rights of the each parent that they abandoned Zaire. Section 17a-112(j) of the General Statutes provides that "[t]he Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . (3) that: (A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . ." The court must determine whether the petitioner has proven, by clear and convincing evidence, that Ms. Azalia L. and Mr. Michael H. had, as of the adjudicatory date of April 17, 2000, abandoned their minor child, Zaire.
 Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . General Statutes [Rev. to 1995] § 17a-112(b)(1) [now § 17a-112(j)(3)(A)] defines abandonment as the [failure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the CT Page 3807 child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . .
In re Kezia M., 33 Conn. App. 12, 17-18, 632 A.2d 1122 (1993). The statute requires DCF to show by clear and convincing evidence that a parent has failed to maintain a reasonable degree of interest in the welfare of his or her child.
 Maintain implies a continuing, reasonable degree of concern not a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance. . . .
(Internal quotation marks omitted.) Id.
(a) Abandonment by the respondent mother
The evidence clearly and convincingly establishes that the respondent mother has abandoned Zaire. She has shown none of the indicia of continuing interest in or concern for her child. Her whereabouts has been unknown to DCF and she has made no effort to contact Zaire since her release from incarceration in November 1999. She failed to show up for the two visits DCF scheduled for her with Zaire after her release.
(b) Abandonment by the respondent father
The evidence overwhelming proves that until Michael H. called the department in January 2000 and requested visitation with Zaire, he had abandoned her. The only indicia of concern for or interest in Zaire until then had been his acknowledgment of paternity and his request that the department consider his female relatives or friends as a caretaker for Zaire. After her removal from her mother's home, the department offered Mr. H. many opportunities to visit with Zaire, but he missed all of his appointments. He never contacted the department to ask Zaire or to send her gifts, letters or cards. Although he occasionally asked the department to place Zaire with these relatives or friends as an alternative to foster care, he never showed any interest in himself being CT Page 3808 the child's caretaker. (Testimony of L. Torres.)
Mr. H.'s testimony that he knew, in the period from March through September 1999, that he was eventually going to be imprisoned for his pending narcotics charges was credible in light of his prior narcotics conviction history. Thus, his asking the department to consider other caretakers might not, viewed in isolation, appear to be the conduct of someone abandoning his child. Mr. H. testified that he was also working, attending classes on HVAC, and participating in drug treatment during that time; the court also finds this testimony to be credible. Mr. H.'s efforts to deal with his problems and better himself for the future, however, showed no concern or interest in his daughter. When asked by his lawyer at trial why he had not visited Zaire between March and September, he stated that getting his life together was really hectic and he was trying to find a stable placement for Zaire until he could take care of her. This explanation does not excuse his utter failure to visit with Zaire, to see her, to attempt to communicate with her, or to exhibit any of the other indicia the courts have identified as showing a reasonable degree of interest in a child. While it was certainly true that, as he testified, he needed to resolve his own problems before he could care for Zaire, he also needed to see his daughter if he wanted to be her parent and have any relationship with her. Mr. H.'s occasional requests that DCF consider other caretakers, in light of all the other evidence, do not meet the standard of a continuing and reasonable demonstration of interest, concern or responsibility for Zaire. The court thus finds, by clear and convincing evidence, that Mr. H. had, until January 2000, abandoned Zaire within the statutory meaning of the term.
The question this case raises, then, is whether Mr. H.'s January 2000 request to see his child, and his visits with Zaire after DCF began taking her to see him at the prison, are conduct sufficient to overcome his earlier abandonment of her. The court notes that as of the adjudicatory date of April 17, 2000, he had probably had only one visit with Zaire, on March 30, and at most two visits if the April visit was before that date, a fact the evidence does not disclose. The court concludes that his request and these visits, whether one or two, or even if the court took into consideration all the monthly visits through the August 8, 2000, amendment to the petition, do not overcome his earlier abandonment of the child.
The factors in the court's consideration of this question are many. They include the following:
 • The respondent tried to contact Zaire only sporadically during the child's first year.
CT Page 3809
 • A long period elapsed during Zaire's first year of life during which the respondent did not try to see the child.
 • The respondent allowed the petitioner to assume full-time responsibility for Zaire during the first year of her life, and chose to pursue his own needs and interests rather than meet hers.
 • The respondent pursued his own employment, job training, and substance abuse rehabilitation with far greater devotion and vigor than he engaged in establishing or maintaining a relationship with Zaire
 • Before January 2000, the respondent made no effort to take advantage of services offered by the department of correction to keep in touch with his children. He missed scheduled visits with Zaire. He failed to inform the petitioner of his whereabouts so that visitations with his child could be arranged. He did not contest the department's June 1999 letter informing him that as a result the department was canceling future visitation.
 • Although a parent's incarceration by itself does not constitute abandonment, our Supreme Court has noted that "the inevitable restraints imposed by incarceration do not in themselves excuse a failure to make use of available though limited resources for contact with a distant child." In re Juvenile Appeal, 187 Conn. 431, 443, 446 A.2d 808 (1982). Here, ironically, it was the respondent's incarceration that resulted in his actually visiting with Zaire. Although he had several times in the past requested visits with Zaire, and the department had arranged such visits, he had always failed to show up for the visits until incarceration confined him at a particular location where the department could take Zaire for a visit.
 • The respondent has never provided any financial support for Zaire.
CT Page 3810
 • From the time of acknowledging paternity in March 1999 until he requested prison visits almost a year later, the respondent had no contact with his child.
From these factors, and taking all the evidence into consideration, the court concludes that Mr. H.'s limited and intermittent displays of interest and the visits at the prison were such sporadic displays of concern and interest that they do not defeat statutory abandonment. "Section 17a-112(b)(1) [now, 17a-112(j)(1)] does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern. . . ." (Internal quotation marks omitted.) In re Kezia M., 33 Conn. App. 12, 18, 632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993). Under this standard, the evidence establishes clearly and convincing that the respondent father had abandoned Zaire (as of both April 17 and August 8, 2000).
3. Failure to Rehabilitate — § 17a-112 (j)(3)(B)
Section 17a-112(1)(3)(B) of the General Statutes sets forth the statutory basis upon which the Commissioner relies in its petition against the respondent mother. It provides in relevant part:
 The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . that . . . the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . .
The court must determine whether the petitioner has proven, by clear and convincing evidence, that Mr. Michael H. had failed, as of the adjudicatory date of April 17, 2000, to achieve the required degree of personal rehabilitation.
The term "rehabilitation" as used in the statute means "`to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation. The statute does not require [a parent] to prove precisely when she will be able to assume a responsible CT Page 3811 position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems." (Internal quotations omitted; internal citations omitted.) In re Eden F., 250 Conn. 674, 706 741 A.2d 873
(1999). The statutory terminology "personal rehabilitation" requires the court to focus on the prospect of restoring a parent "to his or her former constructive and useful role as a parent." In re Tabitha P.,39 Conn. App. 353, 361, 664 A.2d 1168 (1995). "What is a reasonable time is a factual determination that must be made on a case-by-case basis" depending on the needs and situation of the particular child. In reShannon S., 41 Conn. Sup. 145, 154, 562 A.2d 79, aff'd, 19 Conn. App. 20,560 A.2d 993 (1989).
In conducting the inquiry whether the commissioner has established a respondent's failure to rehabilitate by clear and convincing evidence, the trial court must consider:
 • the respondent's rehabilitative status as it relates to the needs of the particular child and
 • whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child. "The statute requires the court to find by clear and convincing evidence that the parent's level of rehabilitation is less than that which would encourage a belief that he or she can assume a responsible position in the child's life within a reasonable time. "In re Shyliesh H, 56 Conn. App. 167, 173, 743 A.2d 165 (1999).
"Thus, the trial court's inquiry requires the determination of both the present and past status of the child, and obtaining a historical perspective of the respondent's child caring and parenting." Id.
In the present case, several factors interfered with Mr. H. assuming a responsible position in the life of his child — his drug addiction, his lack of interest in Zaire, and his unrealistic notions of the task of parenting. Mr. H.'s own testimony acknowledged that during the March to September 1999 period he was not yet ready to care for his child and needed to concentrate on dealing with his substance abuse problem. The discharge notes on his discharge from Wheeler Clinic when he went to prison in September 1999 show an individual still in the process of dealing with his problem. During the six months of treatment up to that point, Mr. H. had missed numerous treatment sessions, had two CT Page 3812 positive drug tests, and still showed signs of denying the seriousness of his problem. Mr. H.'s decision to participate in drug treatment programs in prison reflects his own recognition that he still needed to work on this problem.
His release on parole will be the crucible for testing the success of his drug treatment to date. Until Mr. H. shows that he can live in the community drug-free and without continuing to sell drugs for a significant period of time, he will not be in a reasonable position to care for a child. His own conduct, committing crimes that led to his incarceration, has prevented him from being able to demonstrate his ability to avoid drug selling or drug abuse in the community. The court concludes that the best and most reliable information for assessing his prospects for recovery from substance abuse while in the community is his progress toward rehabilitation in the months just before his incarceration. That evidence is decidedly mixed, showing both participation in drug treatment but also numerous lapses, ranging from positive drug tests, to missed classes, to signs of denial and rationalization. His limited success before prison was, nonetheless, a positive sign for the future, as was his deportment in prison. The court has no way of determining, however, from his limited period of drug treatment whether he was motivated by a genuine desire to free himself from drug abuse or a mere desire to influence the court that would impose sentence on the pending drug charges. Either motivation is equally possible; his lapses during treatment could equally be interpreted as the typical relapses that often plague those trying to overcome the demon of addiction, proof of a cynical effort to reduce his prison sentence, or both. Only his future conduct will demonstrate the truth of his professed motivation. His partial success in treatment to date only augurs thepossibility of continued success. The evidence about his participation in drug treatment thus does not offer any basis for concluding when he might be able to assume a responsible position in Zaire's life; nor does the evidence permit the court to infer that Mr. H. will, within a reasonable period, be sufficiently rehabilitated that he could become a responsible caretaker for Zaire, given her young age and her own needs.
The prism for viewing Mr. H., moreover, includes not only his beginning drug treatment but his criminal and antisocial conduct over the last decade — the increasingly serious criminal behavior, culminating in selling narcotics, his defiance of court orders (to appear for scheduled court dates and to obey terms of probation), and the commission of offenses while on pretrial release and probation. In view of his past behavior, the court must view his professed commitment to overcoming his addiction and his initial partial success in treatment, although positive signs, with some caution. To show himself sufficiently rehabilitated to care for a child will require a track record, a significant period of CT Page 3813 time living in the community drug-free, crime-free, working steadily in lawful employment, becoming a productive, contributing member of society so as to demonstrate he has truly forsaken his prior ways. That may occur, but when, and for how long, there is no possibility of knowing or surmising today. The statutorily required degree of personal rehabilitation is such as "would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." For Mr. H., without a sufficient history of success, the best one can say today is that he might achieve such a rehabilitation in the indefinite future. Yet it is not in the best interest of this infant, Zaire, to wait an indefinite period for permanence or stability.
While Mr. H. may have tried to address his drug problem, as ordered by the court, he utterly failed to comply with various other court orders in the Specific Steps. He did not keep all appointments set by or with DCF. He did not keep his whereabouts known to DCF. He did not participate in parenting classes. His conduct thus shows a pattern of taking steps that would benefit him personally — such as participating in drug treatment or getting training in HVAC — while doing nothing else that would enhance his parenting.
Mr. H.'s testimony at trial showed the same characteristics. He testified convincingly about his desire to address his drug addiction, his good behavior at the prison, and his plans to get a good job upon release. When he testified about his relationship with Zaire or his other children, however, his testimony was fanciful and unrealistic. For example, he testified that upon his release, he plans for all his five children to come live with him. He said that he wanted custody of Zaire so that he can raise her with the rest of her brothers and sisters. He claimed, quite implausibly the court concludes, that the three mothers of his other children intended to give up their children to him upon his release. When asked about his relationship to these other children, he said he had a "beautiful relationship" with them; that he sees them "all the time"; and that they were "always with" him. This virtually utopian depiction of Mr. H. taking care of all five children, perhaps with the various mothers there and perhaps not, and of his relationship with his children shows a person who does not have a realistic notion about being a parent. Even though parenting classes were available to him while in the community and in prison, he failed to take those opportunities. Perhaps if he had done so, he might have developed a more accurate understanding about the role and responsibilities of a parent.
Moreover, at trial Mr. H. at first claimed that he did not realize he had been required to take parenting classes, only admitting that the court had ordered him to do so when confronted with the court's orders CT Page 3814 during cross-examination. Similarly, when asked at trial why he had waited after his incarceration until January 2000 to contact the department, he claimed that his counselors at the various prisons where he was held between September and January had all advised him to wait until he was imprisoned in his final prison location before requesting any visitation; otherwise, by the time visitation was arranged at an interim jail, he would already have been transferred to another facility. Even if visiting were infeasible during his early months of incarceration, which does not seem likely, nothing prevented him from contacting the department, sending cards or letters to Zaire, or attempting to have telephone contact with his daughter. Even at trial, therefore, he continued to exhibit a rationalization and unwillingness to accept the consequences of his actions that are similar to the denial about which his addiction counselor had commented in September 1999.
In assessing the extent of the respondent's rehabilitation toward becoming a responsible parent, moreover, the court must balance his beginning the process of drug rehabilitation with the rest of his conduct. He ignored every opportunity to have contact with Zaire until confined in prison. Even if part of his motivation for not seeing Zaire was the desire to overcome his drug problem, he also chose attending job training in HVAC instead of seeing his daughter. He did not engage in parenting counseling or participate in parent support groups — two services that this court concludes he very much needed. On the witness stand, he displayed a romanticized notion of fatherhood and his relationship with his children. Even though the father of four other children, he acknowledged he had never been the primary caretaker of a child. At trial he justified his requests that DCF consider one of his female relatives or friends as a foster placement by saying he knew he would be incarcerated soon; but his ignoring all opportunity to see Zaire suggests it is even more likely that he was asking DCF to place his daughter elsewhere because he did not perceive himself as ever being her caretaker. Mr. H.'s failure to participate in the parenting groups or to attend the parent support group confirms that he did not intend to care for Zaire; it also prevented him from obtaining the knowledge and skills that would have prepared him to do so.
The DCF case aide who took Zaire to the prison to meet with Mr. H. testified that he acted appropriately with his daughter during those visits. At trial he said he loved all his children. Perhaps, with help and support from others, he could have developed from someone capable of an appropriate one-hour visit into a competent round-the-clock caretaker. But by his conduct he forfeited that opportunity.
Therefore, while Mr. H. has made progress toward addressing his substance abuse, he has not shown any other progress toward becoming CT Page 3815 ready to be a responsible parent. "In assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the child at issue." In re Danuael D.,51 Conn. App. 829, 840, 724 A.2d 546 (1999). Zaire is still a very young child; at the time of trial, she was not yet two years old. She has asthma that requires periodic hospital visits and shows the possibility of fetal alcohol syndrome. A child so young, and Zaire in particular, needs a parent who understands the needs of a child and can respond to them. Nothing in Mr. H.'s testimony shows that ability. Nothing in the evidence shows the possibility that he will have such an ability within a reasonable period of time. This is not a case where a parent with a drug problem need only overcome his addiction to be reunified with the child. In addition to that daunting task, Mr. H. has not shown he knows what parenting responsibilities are. He has not shown a sense of responsibility at all, other than by beginning to address his drug problem.
For all these reasons, and based on the evidence as a whole, the court therefore finds by clear and convincing evidence that the respondent father has failed to rehabilitate himself "as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child."
 III — DISPOSITION
"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citation omitted; internal quotation marks omitted.) In re Roshawn R.,51 Conn. App. 44, 52, 720 A.2d 1112 (1998). In making the dispositional decision in a non-consensual case, "the court is mandated to consider and make written findings regarding seven factors" specified in General Statutes § 17a-112(k).[9] In re Tabitha P., 39 Conn. App. 353,664 A.2d 1168 (1995). Unlike the adjudicatory phase, on disposition the court may consider information through the close of the evidentiary hearing. Practice Book § 33-5. In the dispositional phase of this case, the court has considered the evidence and testimony related to circumstances and events up to and including November 2, 2000, the date upon which the evidence in this matter was concluded.
A. REQUIRED STATUTORY FINDINGS
The court makes the following written findings, as required by General CT Page 3816 Statutes § 17a-112(k). The court has considered these factors and its findings in determining whether it is the best interest of Zaire to terminate the parental rights of Azalia L. and Michael H. In re QuanitraM., 60 Conn. App. 96 (2000), cert. denied 255 Conn. 903 (2000).
 (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent — § 17a-112 (k)(1)
The department offered timely and appropriate services to each respondent. It provided transportation for Zaire to visits with the parents and referred them to needed services for counseling, substance abuse evaluation and treatment, parent support groups, and parenting counseling. After the respondent father's incarceration in September 1999, the Department of Corrections offered substance abuse counseling and treatment and parenting classes to him.
 (2) Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended — § 17a-112(k)(2)
DCF made reasonable efforts to reunite Mr. H. with Zaire. It considered the relatives he proposed as caretakers, it offered him visits with Zaire, and it offered him services that, if he had used and benefitted from them, would have prepared him to be a responsible parent. DCF made reasonable efforts to reunify Zaire with the respondent mother by offering visitation and services to help her overcome her problems until her disappearance after release from prison prevented DCF from offering more reunification services to her.
 (3) The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order — § 17a-112(k)(3).
On March 12, 1999 and May 5, 1999, the court established the following expectations for both respondents:
• Keep all appointments set by or with DCF. Cooperate with DCFhome visits, announced or unannounced, and visits by the child(ren)'sCT Page 3817court-appointed attorney and/or guardian ad litem. Ms. L. did not comply adequately with this expectation. She did not keep all appointments with DCF or service providers or, after her release from prison in November 1999, for visits with Zaire. Mr. H. did not comply with this expectation until he was reincarcerated.
• Keep whereabouts known to DCF and your attorney. The respondent mother did not apprise DCF of her whereabouts after her release from prison on November 23, 1999. Mr. H. failed to keep his whereabouts known to the Department after Zaire's commitment in May 1999. DCF learned he was incarcerated in 1999 only through the efforts of the case worker. After his release from incarceration to a halfway house in mid-October 2000, he again neglected inform the department of his new whereabouts for two weeks.
• Visit child(ren) as often as DCF permits and demonstrateappropriate parent/child interaction during visits. The respondent mother visited consistently with Zaire before and during her incarceration. During many of the prison visits, Ms. L. did not seem to know how to meet daughter's needs. She would appear overwhelmed when Zaire was upset and would turn the child over to the care of the DCF case aide. During those visits, the respondent appeared more interested in gossiping about old boyfriends than focusing her attention on Zaire. Sometimes, Ms. L. even made disparaging remarks toward Zaire; at other times she displayed a lack of warmth and affection for her child. During these visits she showed no capacity to develop a parental relationship with her daughter. (Pet. Ex. 1 at 14.) After Ms. L.'s release from prison in November 1999, she did not contact DCF until January 4, 2000, when she called seeking visitation with Zaire. Although DCF scheduled visits on January 14 and February 3. 2000, and transported Zaire and her sibling, Cashay, to DCF for the visit, Ms. L. did not show up for either visit. The respondent father did not comply with this expectation until several months after his re-incarceration.
• Participate in parenting and individual counseling and makeprogress toward the identified treatment goals. Neither respondent complied with this expectation.
• Submit to substance abuse assessment and follow recommendationsregarding treatment. The respondent mother did not comply with this court expectation. The respondent father has partially complied by participating in a drug treatment at Wheeler Clinic from March to September 1999 and while in prison. While his performance at the Wheeler Clinic was not exemplary, as he had two positive drug tests and missed numerous sessions, overall he made progress there in addressing his drug treatment program. CT Page 3818
• Submit to random drug testing; the time and method of thattesting shall be at the discretion of DCF. The respondent mother did not comply with this expectation. She missed three scheduled substance abuse evaluations in April and May of 1999. By submitting to drug testing at Wheeler Clinic, the respondent father partially complied with this expectation. DCF referred him to ADRC for substance evaluation, however, and he did not comply with that directive. Furthermore, by not doing so or keeping in contact with DCF from March through September 1999, he prevented the department from scheduling random drug tests at its discretion during this period.
• Use providers recommended by DCF: The respondent mother did not comply with this expectation. The DCF worker recommended that she attend the substance abuse evaluation and follow the recommendations, attend parenting classes at the YWCA and seek individual counseling to address her depression; but Ms. L. did not follow any of these service recommendations. The respondent father partially complied with this expectation. He did attend counseling for his substance abuse at Wheeler Clinic, one of the providers DCF recommended for this service. By not going to ADRC for substance abuse evaluation, however, he prevented the department from obtaining information on whether the Wheeler clinic program he participated in was the most appropriate program to address his substance abuse. He did not avail himself of parenting classes, parent support groups, or other services to facilitate reunification with his daughter.
• Secure and maintain adequate housing and legal income. The respondent mother was incarcerated from June to November 1999. She has not provided DCF with any information about her whereabouts, housing, employment or source of income since her last contact with DCF in January 2000. Before his incarceration in November 1999, Mr. H. was employed and engaged in job training in HVAC. The evidence does not disclose his housing status at the time. Since September 1999, he has been in the custody of the Department of Corrections, first in prison and, by the final day of trial, at a halfway house
• No substance abuse. There is no evidence about whether the respondent mother complied with this expectation, since she did not attend the substance abuse evaluations in 1999, has had only two telephone contacts with DCF since her release in November 1999, and has not been heard from again. The evidence clearly establishes that the respondent father did not fully comply with this expectation, as he had two positive drug tests and was intoxicated once while participating in the Wheeler Clinic program before his incarceration in September 1999. The record does not provide any basis, moreover, for concluding how CT Page 3819 frequently he underwent such testing at Wheeler; and since Mr. H. did not go to ADRC or make himself available for random testing that DCF might have directed, the court cannot determine whether other such tests would have been positive or negative.
On May 5, 1999, the court also ordered DCF to:
 • Take all necessary measures to ensure the child(ren)'s safety and well being.
• Provide case management services,
 • Develop periodic treatment/permanency plan and review it with. the Respondent.
 • Refer the Respondent to appropriate services (see above) and monitor his/her progress and compliance,
 • Monitor the welfare of the child(ren) and the circumstances surrounding his/her/their care by the Respondent.
(Pet. Ex. 3.) The court finds that DCF complied with each of these responsibilities.
 (4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties — § 17a-112(k)(4)
Zaire has been placed with the foster family since she was two days old. She is bonded emotionally to them and regards them as her mother and father. She has little feelings for her biological mother. She does not exhibit a close emotional bond to the respondent father either. She shrinks away from him at the beginning of the prison visits, although during the October 2000 visit she did, after her initial tears and reluctance to see Mr. H., become comfortable with him midway through the visitation.
(5) The age of the child — § 17a-112(k)(5)
Zaire was born on March 1999. At the time of trial, she was seventeen CT Page 3820 months old.
 (6) The efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child — § 17a-112(k)(6)
The respondent mother has done nothing to adjust her circumstances, conduct or conditions to make it in the best of interest of Zaire to be reunited with her. She has not maintained contact with Zaire or the department since her release from prison.
The respondent father has done very little to adjust his circumstances, conduct, or conditions to make it in the best of interest of Zaire to be united with him. The one positive thing he did was to begin substance abuse treatment. That treatment was interrupted when he went to prison in September 1999. He continued in treatment while in prison. Yet in terms of long-term recovery from drug addiction, the court has no information on which to project or assess the likelihood that he will avoid drugs upon his release from prison. The fact that he started drug counseling, professed determination during his testimony at trial to refrain from further drug use, and showed himself to be a model prisoner while incarcerated are all positive signs. As noted above, however, Mr. H. did virtually nothing else to adjust his conduct, situation, or circumstances to make it in Zaire's best interest to place her in his home in the foreseeable future. Before being incarcerated, he missed all opportunities to have contact with her or to visit with her; the only visits he had with Zaire were while he was physically confined by the Department of Corrections. Before his incarceration and in the first few months thereafter, he did not maintain any contact with DCF; upon his release to the halfway house on October 14, 2000, that same pattern surfaced again, as he neglected to inform DCF of his new residence. His claim at trial that he was waiting until court to do so does not show a person eager to see his daughter. Waiting those two weeks to notify DCF of his new location missed an opportunity for more contact or visits with Zaire (when he had been in the community previously, the department had CT Page 3821 offered him visits more frequently than only once a month); to ask her; or to express love and affection for her.
 (7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent — § 17a-112(k)(7)
Nothing done by either respondent parent or by anyone else prevented Azalia L. or Michael H. from developing a meaningful relationship with Zaire. Their own choices not to see Zaire, the respondent father before his incarceration and the respondent mother after hers, prevented the use of that time to develop a parent-child bond with their child. Their own conduct led to their incarceration, which limited contacts with their child. There is no evidence that economic circumstances of either parent affected their ability to develop a relationship with Zaire.
B. THE INTERVENING MATERNAL GRANDMOTHER'S REQUEST FOR GUARDIANSHIP
During the trial of this case, the court granted the motion of the maternal grandmother, Denise T., to intervene in the proceeding. The court limited her intervention to the issue of disposition. Through her brief and testimony, she has asked the court to transfer guardianship of Zaire to her and to place the child in her custody. The petitioner, intervener, and minor child have all filed briefs on this matter.
DCF takes the position that a grandparent has
 standing to intervene in the dispositional phase of a termination case [only] unless the purpose of such intervention is to prevent the termination of parental rights. If the grandparent's objective is custody or guardianship or adoption of the child then the grandparent should not be permitted to intervene in the termination trial.
Petitioner's Post-Trial Brief at 3. DCF accordingly argues that since the grandparent did not oppose the termination, the court should reverse its ruling allowing her to intervene. Id. at 4. DCF further argues, if the court considers the merits of the maternal grandmother's request, that she did not prove by a preponderance of the evidence that a transfer of guardianship is in the best interest of Zaire; Id.; a position that the attorney for the minor child also adopts. Brief of Attorney for the Minor CT Page 3822 Child, at 2 and 3.
The court declines to modify its earlier decision allowing the maternal grandmother to intervene. Testimony that she sought guardianship was admitted without an objection of any of the parties. None of the evidence she offered, however, demonstrated that it would not be in the best interest of Zaire to terminate the parental rights of Azalia L. or Michael H. Moreover, the evidence did not establish any basis for believing that it would be in Zaire's best interest to transfer guardianship to the maternal grandmother. The evidence proved to the contrary, as the court discusses in more detail below, that it is in the best interest of Zaire to live with her foster parents, with whom she has spent all but two days of her life and is bonded.
The evidence at trial established that the maternal grandmother loves her granddaughter and wishes to care for her. The maternal grandmother, however, had criminal charges pending against her, as the result of which her own children had been removed from her. As of October 30, 2000, those charges included one count each of assault in the second degree and breach of the peace for an incident alleged to have occurred on April 19, 1999; one count of possession of narcotics and three counts of risk of injury in connection with the police raid of the apartment where she was living with the respondent mother on January 20, 1999; one count of larceny in the sixth degree and of violation of a protective order with arrest dates of July 17, 1997; one count of failure to appear in the second degree on October 26, 1998; and one count of failure to appear in the first degree on August 2, 1999. In total, then, she has six pending felony charges (assault in the second degree, possession of narcotics, three counts of risk of injury, and failure to appear in the first degree) and three pending misdemeanor charges. (Pet. Ex. 26.) The first failure to appear charge is consistent with her own testimony that she left the state after a 1998 court order placing her three children under protective supervision. (Testimony of Denise T.) She admitted on cross-examination, moreover, that after removal of her children in January 1999, she failed to comply with court orders to keep appointments for drug screening. She failed to sign releases requested by the department that would have allowed DCF to monitor her attendance at service providers. On this evidence, the intervening grandmother has not shown by a preponderance of the evidence that she would be an appropriate caretaker for Zaire. The court further finds that it is not in Zaire's best interest to transfer guardianship or custody to Denise T. Accordingly, although having granted the motion to intervene, the court concludes that the intervening grandmother has not offered any evidence to affect the termination of the parental rights of the biological parents.
CT Page 3823
C. BEST INTERESTS OF THE CHILD — § 17a-112(j)(2)
The court is next called upon to decide whether termination of the parental rights of Azalia L. and Michael H. would be in the best interests of the child, Zaire T.[10] From the evidence offered at trial, the court finds by clear and convincing evidence, for the reasons stated, that it is in Zaire's best interest to terminate the parental rights of each biological parent. Neither parent has presented information that it is ready and able to provide adequate care for Zaire now or in the reasonable future. Zaire has known only her foster parents as mother and father. She is very bonded to the foster family, fits in well there, and is happy living with them. She has emotionally and mentally adjusted to living there. They provide a good, nurturing, stable home for her. It could not possibly be in the best interest of such a young child, who has never had significant parenting time or attention from either respondent, to languish even longer in foster placement to see if her mother shows up again and then makes sufficient progress for reunification or to wait for her father to become ready to be a full-time parent.
Based upon the foregoing, the court finds by clear and convincing evidence that it is in Zaire's best interest to terminate the parental rights of Azalia L. and Michael H. The court makes this finding in consideration of Zaire's need for a secure and permanent environment, the secure and nurturing relationship that Zaire has with her foster parents at this time, and the totality of circumstances existing in this case.
 IV — ORDER OF TERMINATION
The court, having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for the termination of each respondent's parental rights and having determined, upon all of the facts and circumstances presented, that it is in the child's best interest to terminate the parental rights of Azalia L. and Michael H. accordingly ORDERS:
The court hereby terminates the parental rights of Azalia L. and Michael H. as to Zaire;
The court appoints the Commissioner of the Department of Children and Families as Zaire's statutory parent for the purpose of securing an adoptive family or other permanent placement for her;
In view of the length of time Zaire has been placed with the present foster family, her bonding with them, and their stated willingness to adopt her, the court directs the Commissioner to give first preference to CT Page 3824 the current foster family for adopting Zaire; and
Within thirty days of this judgment, the Commissioner shall submit a written report addressing such permanency plan; DCF shall file such further reports as are required by state and federal law.
BY THE COURT
STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT CHILD PROTECTION SESSION