IN RE KEZIA M.*
(11933)

DALY, O'CONNELL and HEIMAN, Js.

Argued September 14—decision released October 15, 1993

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 4166B.2, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Mary Ann Barile,* for the appellants (respondents).

*Ann-Marie DeGraffenreidt,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellee (petitioner).

*Pauline E. Lybeck,* with whom, on the brief, was *Gretchen Hellauer,* for the minor child.

DALY, J. This is an appeal by the respondent father and paternal grandmother[1] from the judgment of the trial court terminating the father's parental rights with respect to his minor daughter, Kezia, pursuant to General Statutes § 17a-112 (b) (1), (3) and (4).[2]

---

[1] The paternal grandmother was admitted as an intervening party for dispositional purposes.

[2] General Statutes § 17a-112 (b) (formerly § 17-43a [b]) provides in relevant part: "The superior court upon hearing and notice, as provided in sections 45a-716 and 45a-717, may grant such petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that, with respect to any consenting parent, such parent has voluntarily and knowingly consented to termination of his parental rights with respect to such child or that, with respect to any nonconsenting parent, over an extended period of time, which, except as provided in subsection (c) of this section, shall not be less than one year: (1) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . or (3) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights; or (4) there is no ongoing

On appeal, the respondents argue that the trial court improperly concluded (1) that there was sufficient evidence to support the termination order on the grounds set out in General Statutes § 17a-112 (b) (1), (3) and (4), and (2) that the commissioner of the department of children and youth services (DCYS) had made reasonable efforts to unite Kezia with her father pursuant to General Statutes § 17a-112 (d) (1).[3] We affirm the judgment of the trial court.

The following facts are pertinent to our resolution of this appeal. Kezia was born on February 9, 1987. She

parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. If the court denies a petition for consent termination of parental rights, it may refer the matter to an agency to assess the needs of the child, the care the child is receiving, and the plan of the parent for the child.''

[3] General Statutes § 17a-112 (d) (formerly § 17-43a [d]) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (3) the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (4) the age of the child; (5) the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (6) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.''

resided with her mother until November 3, 1987, when she was placed in foster care. On November 8, 1987, Kezia was found to have been neglected by her mother and was committed to the care and custody of DCYS. Since placement on November 3, 1987, Kezia has lived with her current foster parents. Her half sister, Tameika, also lives there.

On January 4, 1990, DCYS filed a petition seeking to terminate the mother's and father's parental rights, listing Phillip P. as Kezia's father.[4] Subsequently, the mother informed DCYS that Kenneth M. was in fact Kezia's father. On September 13, 1990, after court ordered blood tests had confirmed his paternity, Kenneth acknowledged his paternity of Kezia. At that time, a visitation schedule was arranged so that Kenneth and his mother, Mary M., could spend time with Kezia. In March, 1992, DCYS suspended their visitation rights when it decided that Kezia was not benefiting from these contacts.

On October 9, 1991, DCYS filed a petition seeking to terminate Kenneth's parental rights to Kezia. On November 6, 1991, Kenneth's mother intervened as an equitable party in interest for dispositional purposes. Hearings on the petition for termination were held on April 8, 13, and 30, and May 5, 1992. Kenneth failed to appear on April 8 and May 5. On May 5, 1992, the trial court granted Kenneth's motion to change the child's last name to his own. On October 23, 1992, the trial court found clear and convincing evidence to support the termination of Kenneth's parental rights to Kezia.

In its memorandum of decision, the trial court found that Kenneth's parental rights should be terminated on three of the four grounds specified in General Stat-

---

[4] The parental rights of Kezia's mother were terminated on December 13, 1991.

utes § 17a-112 (b), namely: (1) He had abandoned his child; (2) the child was denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for her physical, educational, moral or emotional well-being; and (3) there was no ongoing parent-child relationship. The court further found that these conditions had existed for more than one year. The respondents, Kenneth and his mother, Mary, appeal from this judgment terminating Kenneth's parental rights as to Kezia.

The termination of parental rights is defined as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . ." General Statutes § 45a-707 (g) (formerly § 45-61b [g]). " 'It is a most serious and sensitive judicial action. *Anonymous* v. *Norton,* 168 Conn. 421, 430, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975).' . . ." *In re Michael M.,* 29 Conn. App. 112, 117–18, 614 A.2d 832 (1992). When petitioning to terminate parental rights without consent, DCYS must allege and prove by clear and convincing evidence, one or more of the specific grounds set forth in General Statutes § 17a-112 (b). *In re Baby Girl B.,* 224 Conn. 263, 293, 618 A.2d 1 (1992); *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 671, 420 A.2d 875 (1979); *In re Michael M.,* supra, 118. "The same evidence certainly can establish more than one ground for termination." *In re Shannon S.,* 41 Conn. Sup. 145, 157, 562 A.2d 79, aff'd, 19 Conn. App. 20, 560 A.2d 993 (1989).

"On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported." *In re Michael M.,* supra, 121; *In re Megan M.,* 24 Conn. App. 338, 342, 588 A.2d 239 (1991); *In re Davon M.,* 16 Conn. App. 693, 696, 548 A.2d 1350 (1988). We do not examine the record to determine whether the trier of fact could have reached a conclu-

sion other than the one reached; *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 222, 435 A.2d 24 (1980); nor do we retry the case or pass upon the credibility of the witnesses. *In re Christine F.,* 6 Conn. App. 360, 366–67, 505 A.2d 734, cert. denied, 199 Conn. 808, 809, 508 A.2d 769, 770 (1986). Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling. *State* v. *Jones,* 205 Conn. 638, 660, 534 A.2d 1199 (1987).

## I

To prevail, the respondents must successfully challenge all three of the bases of the judgment terminating Kenneth's parental rights. If any of the grounds relied on by the trial court are upheld on appeal, the termination of parental rights must stand. *In re Juvenile Appeal (84-BC),* 194 Conn. 252, 258, 479 A.2d 1204 (1984); *In re Kelly S.,* 29 Conn. App. 600, 613, 616 A.2d 1161 (1992). We conclude that two of the three grounds supporting the determination can be sustained. Accordingly, we uphold the trial court's decision to terminate Kenneth's parental rights.

## A

The respondents first claim that the trial court improperly determined that Kenneth had abandoned Kezia. We disagree.

Abandonment focuses on the parent's conduct. *In re Michael M.,* supra; *In re Rayna M.,* 13 Conn. App. 23, 36, 534 A.2d 897 (1987). A lack of interest in the child is not the sole criterion in determining abandonment. *In re Michael M.,* supra; *In re Rayna M.,* supra, 37. General Statutes § 17a-112 (b) (1) defines abandonment as the "fail[ure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . ." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts,

and financial support are indicia of interest, concern or responsibility for the welfare of a child. *In re Luke G.,* 40 Conn. Sup. 316, 323, 498 A.2d 1054 (1985)." (Internal quotation marks omitted.) *In re Michael M.,* supra. Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. *In re Juvenile Appeal (Docket No. 9489),* 183 Conn. 11, 14, 438 A.2d 801 (1981).

Section 17a-112 (b) (1) does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. "A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern." (Internal quotation marks omitted.) *In re Michael M.,* supra; *In re Rayna M.,* supra, 37–38; *In re Migdalia M.,* 6 Conn. App. 194, 208–209, 504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986).

" 'The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance.' " *In re Juvenile Appeal (Docket No. 9489),* supra, 15, quoting *In re Adoption of Webb,* 14 Wash. App. 651, 657, 544 P.2d 130 (1975).

The trial court found that Kenneth has four children by three different mothers. He has not been married nor has he been regularly employed. He lives from one third to one half of the year at his mother's house where one of his daughters permanently resides; his stays

there are sporadic. Kenneth has never suggested that he would ever serve as Kezia's primary caretaker. He has expressed no desire to provide a home of his own for his children. Although his chief concern is that Kezia know he is her father, he has visited her on only ten occasions in the two years since he acknowledged paternity.

The trial court found clear and convincing evidence that Kenneth had abandoned Kezia. In light of the facts found and Kenneth's course of conduct, it is apparent that he manifested no reasonable degree of interest, concern or responsibility for Kezia's welfare. We conclude that the findings of subordinate facts amply support the conclusion reached on the issue of abandonment and that no erroneous rule of law was applied by the trial court. The trial court properly concluded that Kenneth had abandoned his child as defined in § 17a-112 (b) (1).

B

The respondents next claim that the trial court improperly concluded that DCYS had proved by clear and convincing evidence that Kenneth had denied Kezia the care necessary for her well-being. We agree.

General Statutes § 17a-112 (b) (3) authorizes the termination of parental rights where "the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his [or her] physical, educational, moral or emotional well-being." This provision authorizes the termination of parental rights where specific acts of parental commission or omission have caused serious physical or emotional injury to the child. See *In re Theresa S.*, 196 Conn. 18, 25–27, 491 A.2d 355 (1985); *In re Kelly S.*, supra, 614; *In re Sean H.*, 24 Conn. App. 135, 144–45, 586 A.2d 1171, cert. denied, 218 Conn. 904, 588 A.2d 1078 (1991).

Here, Kezia has been in the custody and control of DCYS since shortly after birth. No injury has befallen her as a result of acts of commission or omission by her parents. She could not have been denied the care, guidance or control necessary for her physical, educational, moral or emotional well-being by reason of parental acts while in foster care. See *In re Kelly S.,* supra; *In re Shannon S.,* supra.

Because there is no evidentiary support for this conclusion, the finding of the trial court terminating parental rights pursuant to General Statutes § 17a-112 (b) (3) cannot be sustained.

## C

The respondents also claim that the trial court improperly found that there was no ongoing parent-child relationship between Kenneth and Kezia within the meaning of General Statutes § 17a-112 (b) (4), and that to allow further time for the establishment of such a relationship would be detrimental to the best interest of Kezia. We find no error.

Section 17a-112 (b) (4) provides for the termination of parental rights if, upon clear and convincing evidence, it is proved that no ongoing parent-child relationship has existed in excess of one year. This part of the statute requires the trial court to undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop. *In re Juvenile Appeal (Anonymous),* supra, 670; *In re Michael M.,* supra, 128; *In re Megan M.,* supra, 340; *In re Juvenile Appeal (84-6),* 2 Conn. App. 705, 708, 483 A.2d 1101 (1984), cert. denied, 195 Conn. 801, 487 A.2d 564 (1985); *In re Juvenile Appeal (84-3),* 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984).

"It is reasonable to read the language of 'no ongoing parent-child relationship' to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced." *In re Juvenile Appeal (Anonymous),* supra; *In re Jessica M.,* 217 Conn. 459, 470, 586 A.2d 597 (1991); *In re Juvenile Appeal (84-6),* supra, 708–709. In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. See *In re Michael M.,* supra, 129; *In re Megan M.,* supra, 341. The ultimate question is whether the child has no present memories or feelings for the natural parent. *In re Jessica M.,* supra, 468; *In re Juvenile Appeal (84-6),* supra, 709. Feelings for the natural parent connotes feelings of a positive nature only. *In re Jessica M.,* supra, 469; *In re Juvenile Appeal (84-6),* supra.

An ongoing parent-child relationship is one that develops " 'as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child'. . . ." *In re Jessica M.,* supra, 463–64. The fact that Kenneth had some contact with Kezia does not preclude a determination that there has been no ongoing parent-child relationship for a period in excess of one year. See *In re Juvenile Appeal (Anonymous),* supra, 670.

The trial court found that Kenneth had never met on a continuing day-to-day basis the physical, emotional, mental and educational needs of Kezia and does not aspire to do so in the future. Kezia has no positive emotional ties to her father. Instead, she exhibits indifference or hostility toward him. Kenneth has had approximately two years in which to establish a relationship with his daughter but he has failed to do so. In this case, DCYS presented ample evidence to satisfy

the statutory requirement of establishing the absence of an ongoing parent-child relationship between Kenneth and Kezia for more than one year.

To satisfy the second prong, the trial court was required to determine whether it would be in the child's best interest to allow additional time for the establishment of a parent-child relationship. *In re Juvenile Appeal (84-6),* supra, 708. The "best interest" standard, therefore, does not become relevant until after it has been determined that no ongoing parent-child relationship exists. *In re Michael M.,* supra, 128.

The factors to be considered in deciding whether it would be in Kezia's best interest to permit further time for a relationship with her father to develop include (1) the length of stay with her foster parents, (2) the nature of her relationship to her foster parents, (3) the degree of contact maintained with the natural parent, and (4) the nature of her relationship to her natural parent. *In re Juvenile Appeal (Anonymous),* supra, 663. In addition, the genetic bond shared by a biological parent and his or her child, although not determinative of the issue of the best interest of the child, is certainly a factor to consider. *McGaffin* v. *Roberts,* 193 Conn. 393, 405, 479 A.2d 176 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1747, 84 L. Ed. 2d 813 (1985).

"The psychological testimony from professionals is rightly accorded great weight in termination proceedings." *In re Nicolina T.,* 9 Conn. App. 598, 605, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987). The respondents' expert, Charlene Alderfer, a family therapist, recommended the need for additional time to develop a parent-child relationship, after observing Kezia interact with her father for only twenty minutes. In contrast, DCYS's expert clinical psychologist, David Mantell, concluded, after twenty to thirty hours of evaluation, that to permit further time to establish

such a relationship would be detrimental to Kezia. Mantell believed Kezia's visits with Kenneth affected her adversely. Mantell felt that Kezia will be harmed if she is removed from her foster home because of her strong emotional ties to and positive feelings for her foster parents.

The trial court was free to judge the credibility of the expert witnesses. See, e.g., *State* v. *Gonzalez,* 206 Conn. 391, 408–409, 538 A.2d 210 (1988); *State* v. *DeAngelis,* 200 Conn. 224, 230, 511 A.2d 310 (1986); see also 2 B. Holden & J. Daly, Connecticut Evidence (2d Ed. 1988) § 118c. The trial court found that Kezia is over five and one-half years of age and that she has been living with her foster parents since she was nine months old. In addition, the court found that Kezia has strong positive feelings and emotional ties toward her foster parents whom she regards as her mother and father. In contrast, Kezia harbors negative feelings toward Kenneth.

If the respondents were to succeed in reinstating Kenneth's parental rights, Kenneth's mother would become Kezia's primary caretaker since Kenneth has no intention of assuming the responsibilities of parenthood. Kezia's grandmother, however, is apparently oblivious to the trauma that Kezia will experience if she is separated from her foster parents. Rather, the grandmother is more concerned with providing a companion for Kezia's sister, who is presently living with the grandmother.

Given these facts and the fact that Kenneth has neither the inclination nor the ability to be a responsible parent, we uphold the trial court's finding that termination was in the best interest of the child.

## II

The respondents' final claim is that the trial court should have dismissed DCYS's termination petition

because DCYS failed to make reasonable efforts to reunify Kezia with them. We disagree.

General Statutes § 17a-112 (d) provides that "the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent . . . ." The respondents claim that DCYS failed to provide adequate services.

The trial court found that DCYS offered the respondents visitation with Kezia. An open visitation policy was initiated by DCYS between September, 1990, and November, 1991, where weekly visits with Kezia were encouraged. In November, 1991, a semiweekly visitation schedule was established. Despite having the opportunity to visit Kezia often, Kenneth did so only ten times between September, 1990, and February, 1992. The court noted that his primary concern was to be recognized as Kezia's father and not to facilitate Kezia's return to his home in the near future.

The trial court further found that Kenneth never sought and was not offered services to improve his parenting skills. The court reasonably could have inferred from his lifestyle and lack of initiative in becoming the caretaker of any of his other three children that it would have been futile to provide additional supportive services to the respondents in an attempt to reunite the family.

The judgment is affirmed.

In this opinion the other judges concurred.