MEMORANDUM OF DECISION
This case is a petition brought by the Commissioner of Children and Families (DCF) to terminate the parental rights of Raymond D., the father of the minor child, Samantha D., at issue in this proceeding. DCF has alleged three grounds for terminating the respondent's parental rights — abandonment, no ongoing parent-child relationship, and failure to rehabilitate. For the reasons stated below, the court grants the petition.
The trial of this case was held before this court on March 12, 2001. The respondent father was present at trial and represented by counsel. The petitioner and the minor children were represented by their respective counsel throughout the proceeding. The petitioner called as its witnesses clinical psychologist Nancy Randall, D.Psy., who conducted court-ordered psychological evaluations of the respondent and minor child and evaluated separate interactional sessions of Samantha with the respondent and her current foster mother; and DCF social worker Diane LaGrega. The respondent did not offer testimony from any witnesses. The sole exhibits offered into evidence were five documents introduced by DCF.
The court finds that the Child Protection Session of the Superior Court for Juvenile Matters has jurisdiction over the pending matter. The court finds that all parents were served with the petitions and have appeared through counsel. Other than a petition to terminate the parental rights of Samantha's mother also pending before this court, and which the court this day has also granted, no action is pending in any other court affecting custody of the child. The court has carefully considered the verified petition, all of the evidence, including the social study and addendum entered into evidence as exhibits, and the testimony presented, according to the standards required by law.[1] Upon such consideration, the court finds that the following facts were proven by CT Page 8974 clear and convincing evidence at trial.
 I. — BACKGROUND AND PROCEDURAL HISTORY
Samantha was born on August, 1996, to Raymond and Carol D. Her parents later married each other on May 10, 1997. Two children born previously to her mother by other fathers, Matthew R. and Brian R. also lived in the household with Samantha and her parents. (Pet. Ex. 3.) Both parents abused drugs and alcohol while living together. While living with Carol, Raymond on occasion physically and verbally abused her. (Pet. Ex. 5 at 3.) Mr. D. also yelled at the children. Id. On August 21, 1996, Brian had dental surgery to remove his front teeth, his mother claiming the child had fallen down while running and broken his teeth. On October 12, 1997, Brian, then three years old, showed up at school with numerous bruises on his face. Physical examination by a doctor at Day Kimball Hospital revealed that he also had bruises on his penis and big toes. When DCF concluded that the parents' stated reasons for these injuries were inconsistent with the nature of the bruises and that the children were in physical danger, DCF invoked a 96-hour hold, took all the minor children in the household into state custody, and then obtained an Order of Temporary Custody on behalf of all three children. (Pet. Ex. 3 at 9.) Within months thereafter, in May 1998, Raymond D. moved out of the family home and Ms. D. filed for divorce, ad. at 4.)
On June 17, 1998, the court, Quinn, J., found Samantha and her half-siblings, Brian and Matthew, to be neglected children, entered an adjudication of neglect as to each child, and committed each to the custody of DCF for a one-year period. The court that day entered an order of Expectations that the respondent father should fulfill to improve his chances of reunification with Samantha. Those expectations directed Mr. D. to:
• Keep all appointments set by or with DCF;
• Keep his whereabouts known to DCF and his attorney;
• Visit the child as often as DCF permits;
 • Participate in parenting counseling, drug and alcohol counseling, and inpatient substance abuse treatment as recommended by United Services;
• No substance abuse;
• No further involvement with criminal justice system (Pet. Ex. 2.)
CT Page 8975 On December 22, 1999, DCF filed the present petition to terminate Mr. D.'s parental rights, alleging the grounds of failure to rehabilitate, abandonment, and no ongoing parent-child relationship.
 II — ADJUDICATORY DECISION
"Under § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the [statutory] grounds for termination of parental rights set forth in [§ 17a-112 (c)] exists by clear and convincing evidence. The commissioner . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. . . . In re Eden F., 250 Conn. 674, 688-89, 741 A.2d 873
(1999)." In re Quanitra M., 60 Conn. App. 96, 102, ___ A.2d ___; cert. denied, 254 Conn. 903 (2000). "In the adjudicatory phase of a termination hearing, the trial court determines if one of the statutory grounds for termination of parental rights is proven by dear and convincing evidence. In malling the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment." In re Tabitha P., 39 Conn. App. 353, 367,664 A.2d 1168 (1995); Practice Book § 33-3(a). In the present case, the adjudicatory date is December 22, 1999, the date of the filing of the petition seeking termination of Mr. D.'s parental rights.
As to the adjudicatory phase of this hearing of the petition for termination of parental rights, the court has considered the evidence and testimony related to circumstances and events following the adjudication of neglect on and until December 22, 1999, when the TPR was filed.
A. Reasonable Efforts
To terminate parental rights for a non-consenting parent, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b that such efforts are not appropriate." General Statutes § 17a-112 (j)(1). The court finds by clear and convincing evidence that DCF made reasonable efforts to locate the respondent father, and did in fact locate him and serve him with process.
With regard to the required element of reasonable efforts to reunify, the petition here alleges that the court had previously found at a CT Page 8976 hearing that reunification efforts were no longer appropriate. Prior to the commencement of evidence in this case, the parties entered into a stipulation that this court might take judicial notice that on May 26, 1999, the court found, after a hearing held pursuant to General Statutes §§ 17-17a-110 (b)[3] and 17-17a-111b (b), that further efforts to reunify the respondent with Samantha were no longer appropriate, and this court so finds.
B. Statutory Grounds for Termination
Trial of a petition to terminate parental rights has two phases, adjudication and disposition. To prevail in a non-consensual termination of parental rights case, DCF must prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In reMichael B., 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied,247 Conn. 919, 722 A.2d 807 (1998); General Statutes § 17a-112 (j) (3). "In the adjudicatory phase of a termination hearing, the trial court determines if one of the statutory grounds for termination of parental rights is proven by clear and convincing evidence. In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment."In re Tabitha P., 39 Conn. App. 353, 367, 664 A.2d 1168 (1995); Practice Book § 33-3(a).
1. Failure to Rehabilitate
Section 17a-112 (c)(3)(B) of the General Statutes (now, § 17a-112
(j)(3)(B)), as modified by Section 4 of Public Act 99-66 and effective October 1, 1999, sets forth one statutory basis upon which the Commissioner relies in its petition against the respondents. It provides in relevant part that
 The Superior Court . . . may grant a petition filed pursuant to this section if it finds by dear and convincing evidence . . . that . . . the parent of a child who (1) has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . and such parent has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable dine, considering the age and needs of the child, such parent could assume a responsible position in the life of the child;. . . .
CT Page 8977 The court must determine whether the petitioner has proven, by clear and convincing evidence, that Mr. Raymond D. had failed, as of the applicable adjudicatory date of December 22, 1999, to achieve the required degree of personal rehabilitation.
The term "rehabilitation" as used in the statute means "to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation. The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems." (Internal quotations omitted; internal citations omitted) In re Eden F., 250 Conn. 674, 706,741 A.2d 873 (1999) "In assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." In re Danuael D.,51 Conn. App. 829, 840, 724 A.2d 546 (1999). The statutory terminology "personal rehabilitation" thus requires the court to focus on the prospect of restoring a parent "to his or her former constructive and useful role as a parent." In re Tabitha P., 39 Conn. App. 353,361, 664 A.2d 1168 (1995). "What is a reasonable time is a factual determination that must be made on a case-by-case basis" depending on the needs and situation of the particular child. In re Shannon S.,41 Conn. Sup. 145, 154, 562 A.2d 79, aff'd,19 Conn. App. 20, 560 A.2d 993 (1989).
In conducting the inquiry as to whether the commissioner has established a respondent's failure to rehabilitate by clear and convincing evidence, the trial court must consider:
 • the respondent's rehabilitative status as it relates to the needs of the particular child and
 • whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child. "The statute requires the court to find by clear and convincing evidence that the parent's level of rehabilitation is less than that CT Page 8978 which would encourage a belief that he or she can assume a responsible position in the child's life within a reasonable time." In re Shyliesh H., 56 Conn. App. 167, 173, 743 A.2d 165 (1999).
"Thus, the trial court's inquiry requires the determination of both the present and past status of the child, and obtaining a historical perspective of the respondent's child caring and parenting." Id.
The crux of the adjudicatory ground of failure to rehabilitate is whether a parent has sufficiently addressed the problems and deficiencies in parenting that led to state intervention in the family so that the parent can, or will be able in the reasonably foreseeable future, considering the age and needs of the child, to assume a responsible position in the life of the child. As the Appellate Court recently noted in In re Sarah Ann K., 57 Conn. App. 441, 448 (2000), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." The court finds by clear and convincing evidence that the respondent father, Raymond D. had, by the adjudicatory date of December 22, 2000, failed to rehabilitate himself to the extent that he could then, or would be able in the reasonably foreseeable future, to care responsibly and adequately for Samantha, in light of her age and needs.
In looking at the question of personal rehabilitation, the court must first consider the deficiencies in parenting that placed the children in jeopardy and led to DCF intervention in the first place. The evidence in this case disclosed four specific issues affecting Mr. D.'s ability to provide adequate and responsible care for his daughter: a history of aggressive and criminally assaultive behavior inflicted on children and adults with whom he has lived and others; traumatic brain injury that has resulted in poor impulse controls and attendant behavioral problems; a severe anxiety disorder and depression; and drug and alcohol abuse. The evidence clearly and convincingly established that these problems, which remained untreated as of the adjudicatory date, prevented him from being able to provide adequate care for his daughter as of that date or in the reasonably foreseeable future.
The evidence revealed numerous instances in which Mr. D. had engaged in assaultive or aggressive behavior. These included:
 • The conduct that resulted in the death of another person and the respondent being convicted in 1985 of the crime of manslaughter in the first degree, for which he received a sentence of 20 years, suspended after eight years, with five years CT Page 8979 probation;
 • Physical and verbal abuse toward Carol D. while they were living together;
 • Physical abuse of Brian in at least one instance — Mr. D. caused the injuries to Brian that led to removal of the children from their parents' custody in 1997, and he eventually pleaded guilty to the charge of assault in the third degree in connection with that abuse; and
 • An assault of another individual in December 1998 that resulted in another conviction for assault in the third degree on March 8, 1999.
In 1992 Mr. D. was injured as the result of being hit by a tractor trailer truck and suffered a traumatic brain injury (TBI), as the result of which he became totally and permanently disabled from being able to work. (Pet. Ex. 5 at 6). His impulse control is limited in emotionally charged situations, and as a result he often exercises poor judgment. His thinking is also concrete and simplistic. While the limited impulse control, poor judgment, and concrete thinking are typical of people with traumatic brain injuries, the court finds credible the conclusion of Dr. Randall here that the TBI "is most likely responsible for some part of this, though not all of it," (Pet. Ex. 5 at 13), particularly in view of the manslaughter conviction predating the TBI.
In addition, Mr. D. has a severe anxiety disorder that prohibits him from fully participating in many activities; (Pet. Ex. 5 at 18); and manifests itself in making it very difficult for him to talk with or in front of people he does not know well. This disorder is a "stumbling block for him as far as obtaining adequate treatment, as he is quite fearful of having to talk in front of people about his problems." Id. Moreover, he also has problems with depression, as the result of which he often feels sad and hopeless. Id. Although his anxiety disorder is a major barrier to his optimal functioning, he has not been willing to seek treatment for it. Id. at 17.
For many years Mr. D. has used marijuana to alleviate his anxiety "as it is one of the few ways he knows to calm himself." Id. at 14. Consequently, he has a string of arrests and convictions for possession of marijuana. He also abused alcohol during his marriage with Carol.
To help Mr. D. address these problems, the court-ordered Expectations of June 1998 directed him to engage in counseling and substance abuse CT Page 8980 treatment. DCF referred him to United Services for a substance abuse evaluation, which he attended. When United Services recommended and referred him to the Day-Kimball partial hospitalization program to address his substance abuse problem, he refused to participate in that program after attending there briefly. (Testimony of Diane LaGrega.) He was advised to seek inpatient treatment but he refused to do that because of his fear of talking in front of other people. (Pet. Ex. 5 at 6.) At trial, Mr. D.'s attorney argued that DCF's referral to a group treatment program for Mr. D.'s substance abuse was inappropriate in light of the respondent's anxiety disorder. In his interview with Dr. Randall, however, Mr. D. candidly acknowledged that he had not really made an effort to benefit from drug treatment referrals: "He said that when he went to programs before, he was not really trying. It was more of a game for him, to see how much he could get away with." (Pet. Ex. 5 at 6.)
Moreover, Dr. Randall concluded, and this court finds her professional conclusion credible on this point, that "he is unlikely to be successful in his recovery [from substance abuse] unless he is able to obtain adequate treatment for his anxiety disorder. He is desperately in need of good psychiatric care for this." Id. at 14. To help Mr. D. address his anxiety disorder, DCF, recognizing this need, in fact referred him to United Services for individual therapy, but he did not stay in therapy or complete it successfully. (Testimony of Diane LaGrega.) At one point, he saw a psychiatrist (the evidence does not clarify whether this was the result of a DCF referral or someone Mr. D. saw on his own) who prescribed the medication Paxil for his anxiety and depression, but stopped taking it after only two weeks because it made him tired. (Testimony of Dr. Nancy Randall.)
The court therefore concludes, in light of DCF's referrals to individual therapy, Mr. D.'s admitted lack of cooperation in substance abuse programs to which he had been referred in the past and his unwillingness to participate in the psychiatric treatment necessary to address the anxiety and depression that inhibit his ability to participate in drug treatment programs, that DCF offered him reasonable opportunities to address his problems, and he declined to take advantage of or benefit from them.
In assessing whether a parent has met the required degree of rehabilitation, the court must consider the age and needs of the particular child. On the adjudicatory date of December 22, 1999, Samantha was almost three years old. At the time of trial on March 12, 2001, she was four years old. She has been in foster care for much of her life since she was fourteen months old, when she was first removed from her parents' custody (in October 1997). The court takes judicial notice of the contents of its own files and finds that on May 26, 1999, the court, CT Page 8981 Mack, J., granted a DCF motion to revoke Samantha's commitment to DCF and returned Samantha to her mother's care under an order of protective supervision; but only a month later DCF petitioned the court to modify that order to return her to DCF custody on the grounds that her mother had not followed DCF recommendations. On September 9, 1999, the court, Mack, J., again committed Samantha to DCF custody, where she has remained since. As of the adjudicatory date, she had been in two foster homes, and some time in early 2000 DCF placed her in a pre-adoptive foster home. (Pet. Ex. 5 at 8.)
Although she has sometimes had episodes of screaming in her sleep, Samantha has adjusted well to the years of foster care and changing foster homes, other than the normal emotional trauma that multiple changes in caretakers and living situations would cause any child her age. She has no significant psychological, emotional or behavioral problems and is able to develop appropriate attachments with others. She is, in the words of Dr. Randall, a "fairly normal" child. At her young age, however, after having spent twenty-two of the first thirty-eight months of her life in foster care as of the adjudicatory date, and fifteen more months in foster care between the adjudicatory date and the time of trial, Samantha needs, as Dr. Randall testified at trial, a stable and permanent home.
The court finds that the evidence clearly and convincingly establishes that Mr. D. had failed, as of the adjudicatory date of December 22, 1999, to rehabilitate himself to the point that he could then assume a responsible position in Samantha's life, in light of her age and needs. The evidence establishes Mr. D. had done nothing, either by that date or the time of trial, to address the many serious issues that led to Samantha's removal from his care. As of the adjudicatory date, he was not prepared or able to care for or raise any child. His many problems still impaired his judgment and posed a significant risk that he would, in a fit of anger or lost control, physically harm her, as he once did Brian; his continuing struggle with severe anxiety, depression and substance abuse precluded him from assuming a responsible position in the life of Samantha or any other child.
Moreover, the evidence establishes that until he receives and benefits from psychiatric care, his anxiety disorder and depression will continue to plague him and he will not be able to participate in or benefit from substance abuse treatment. Nothing in the evidence offered any prospect that any treatment could ever check his limited impulse control, improve his judgment, or curb his propensity for assaultive or violent behavior. As Dr. Randall concluded, and this court concurs, Mr. D. desperately needs psychiatric care, yet has been reluctant to seek such treatment. The court finds credible the expert opinion of Dr. Randall that it would CT Page 8982 be detrimental to Samantha to wait longer for her any longer for such. (Testimony of Dr. Nancy Randall.) The court thus finds, by clear and convincing evidence that, as of the adjudicatory date, Mr. D. had not achieved such a level of personal rehabilitation that he could assume a responsible position in Samantha's life either then or within a reasonably foreseeable time thereafter, in view of that child's age and needs.
2. Abandonment
The petitioner has asserted, as another statutory ground for terminating the parental rights of Raymond D., that he abandoned Samantha. Section 17a-112 (j) of the General Statutes provides that
 [t]he Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . (3) that: (A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . .
"Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . General Statutes [Rev. to 1995] § 17a-112 (b)(1) [now § 17a-112
(j)(3)(A)] defines abandonment as the [failure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . ." In re Kezia M., 33 Conn. App. 12, 17-18, 632 A.2d 1122
(1993).
The statute requires DCF to show by clear and convincing evidence that a parent has failed to maintain a reasonable degree of interest in the welfare of his or her child. "Maintain implies a continuing, reasonable degree of concern" not "a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child." "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to CT Page 8983 furnish social and religious guidance. . . ." (Internal quotation marks omitted.) Id.
The evidence in the present case establishes clearly and convincingly that Mr. D. had, as of the adjudicatory date and through the time of trial, abandoned Samantha. After her removal from his custody in October 1997, he initially had weekly visits with her. But in May 1998, DCF concluded that his demeanor and conduct during the visits were a problem. He was depressed, would turn away from Samantha during the visits in a quite distraught manner, would get belligerent and angry in front of Samantha, and would appear to be under the influence of marijuana or alcohol when he showed up for visitations but would deny having abused any substances. DCF suspended his visits when he refused to seek treatment for his mental and substance abuse problems. (Testimony of Diana LaGrega.)
From that point on, he never had any more contact with Samantha until his one interactional session with her conducted by Dr. Randall in June 2000. Id. He never wrote or called to her, or to DCF inquiring about her. He never sent her cards, letters, or gifts. He provided no financial support for her. Id. He also lost contact with DCF, which did not know where he was after he separated from Samantha's mother in May 1998 until June 2000. This is classic evidence of abandonment, as he has shown no continuing or reasonable degree of concern at all for her, except for certain tender moments during the June 2000 interactional session conducted by Dr. Randall. While he may, as Dr. Randall concluded, love his daughter, his behavior since May 1998 has shown none of the "commonly understood" attributes of parental concern: never expressing love or concern for Samantha, or her health education or well being; never supplying any food, clothing, medical care, or domicile; never providing moral, social or religious guidance; and never making any attempt to maintain contact with her. He has neither shown nor maintained any interest, concern or responsibility as to his daughter's welfare. The court therefore finds by clear and convincing evidence that he had, as of the adjudicatory date, abandoned his daughter.
3. No ongoing parent-child relationship
The remaining statutory ground alleged for termination of Mr. D.'s parental rights is the petition's allegation that there is no ongoing parent-child relationship between the Samantha and him, pursuant to General Statutes Section 17a-112 (j)(3)(D), which establishes an adjudicatory ground for termination of parental rights where:
 there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a CT Page 8984 result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child; . . .
Under this section, the court must "undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop." In Re John G., 56 Conn. App. 12,22, 740 A.2d 496 (1999). "In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent." (Citations omitted.)In re John T., supra at 23. This standard contemplates a relationship that has some positive attributes. In re Jessica M., 217 Conn. 459, 470,586 A.2d 597 (1991).
The evidence in this case is absolutely crystal clear that there is no ongoing parent-child relationship between Mr. D. and Samantha. The court finds persuasive on this point the testimony and report of Dr. Nancy Randall, the court-appointed psychologist. During the court-ordered parent-child interactional session between them, Samantha did not recognize Mr. D. as her father, admitted this lack of recognition, and never referred to him as daddy or father. (Testimony of Dr. Nancy Randall.) Her failure to recognize him did not surprise Mr. D., as he before the interview "he acknowledged . . . that she would no longer know him as it has been so long since he saw her." (Pet. Ex. 5 at 13.) He had not seen her since DCF suspended his visitations with her in May 1998, when she was but 21 months old. Two years had elapsed since then at the time of the parent-child interactional evaluation. As Dr. Randall explained at trial, the first fourteen months of her life, when she lived with her father before DCF took custody of her, had been long enough for her to develop to develop a parental relationship with her father, but for a child of Samantha's age, such a relationship would not continue indefinitely while they were apart. The result of Mr. D.'s failure to maintain contact with her, through visiting and all the other ways that absent parents have traditionally maintained a relationship with their children, was inevitable. It was the ineluctable consequence of the respondent's own conduct that Samantha has no present feelings for or memories of her biological father.
The court therefore finds that the evidence establishes clearly and convincingly that, both on the adjudicatory date and at the time of CT Page 8985 trial, there was no ongoing parent-child relationship between Mr. D. and Samantha. Since Samantha was removed from his care in October 1997, the respondent has never met any of her day-to-day needs. He has never provided any guidance or nurture for her. Since May 1998 he has seen her only once, during the parent-child interactional session where she did not recognize him as her father. The effect on Samantha of her father's lack of contact with her was predictable. When the DCF removed her from her parent's care, Samantha obviously knew the respondent as her father. Since then, because of his failure to maintain contact with her, she has lost all memory of him. As of the adjudicatory date, Samantha no longer remembered his father, did not know him to be her parent, regarded his present foster mother as her psychological parent, and had no present positive feelings whatsoever for his father.
"To satisfy the second prong [of the analysis], the trial court [is] required to determine whether it would be in the child's best interest to allow additional time for the establishment of a parent-child relationship. . . . The `best interest' standard, therefore, does not become relevant until after it has been determined that no ongoing parent-child relationship exists." (Citation omitted.) In re Kezia M.,33 Conn. App. 12, 22, 632 A.2d 1122, cert. denied, 228 Conn. 915,636 A.2d 847 (1993). The factors to be considered in deciding whether it would be in his best interest to permit further time for a relationship with his father to develop include "(1) the length of stay with her foster parents, (2) the nature of her relationship with her foster parents, (3) the degree of contact maintained with the natural parent and (4) the nature of her relationship to her natural parent. Id.
Nearly five years old at the time of trial, Samantha has lived in foster care for more than half her life. Dr. Randall conducted a clinical interview of Samantha with her pre-adoptive foster mother, with whom Samantha had been then living for approximately two and one-half months. During that short interval, Samantha had already begun seeking nurture, affection, and security from her foster mother, who had already assumed the role of her psychological parent. Samantha has had no contact with her father for almost three years, other than the interactional assessment a year ago, and has no relationship at all with him. Although she is developmentally on target and has no known behavioral or psychological problems, a child Samantha's age needs permanence and stability in her family. She needs to know that she has parents she can rely on and who will support and nurture her over the long term.
Unfortunately for Mr. D., there is absolutely no evidence that he will ever be able to offer Samantha either permanence or stability. His own limitations and disabilities prevent him from offering her a stable home that could meet her needs, as of the adjudicatory date, now or in the CT Page 8986 reasonably foreseeable future. The court therefore finds by clear and convincing evidence that it would not be in Samantha's best interest to allow further time for a relationship with her father to develop.
 III — DISPOSITION
"If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citation omitted; internal quotation marks omitted.) In re Roshawn R., 51 Conn. App. 44, 52, 720 A.2d 1112 (1998). In making the dispositional decision in a non-consensual case, "the court is mandated to consider and make written findings regarding seven factors" specified in General Statutes § 17a-112(k).[4] In reTabitha P., 39 Conn. App. 353, 664 A.2d 1168 (1995). Unlike the adjudicatory phase, on disposition the court may consider information through the close of the evidentiary hearing. Practice Book § 33-5. In the dispositional phase of this case, the court has considered the evidence and testimony related to circumstances and events up to and including March 12, 2001, the date upon which the evidence in this matter was concluded.
A. Required Statutory Findings
The court makes the following written findings, as required by General Statutes § 17a-112 (k). The court has considered these factors and its findings in determining whether it is in Samantha's best interest to terminate the parental rights of Mr. Raymond D. In re Quanitra M.,60 Conn. App. 96 (2000), cert. denied 255 Conn. 903 (2000).
 1. The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent — § 17a-112 (k)(1).
DCF offered timely, reasonable, and appropriate services to Mr. D. to enable him to address the problems that interfered with his ability to provide adequate care for his daughter: referrals for individual therapy for his anxiety disorder, depression, and other mental problems, referrals for substance abuse and treatment for his drug use, and referrals for parenting counseling to learn how to provide good care for his daughter.
 2. Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption CT Page 8987 Assistance and Child Welfare Act of 1980, as amended — § 17a-112 (k)(2)
Through examination of witnesses and during closing argument, the respondent's attorney claimed that DCF had not responded adequately to the difficulty the respondent has, because of his anxiety disorder, participating in group treatment settings. There admittedly might be a case where a respondent's psychiatric disorder precluded certain treatment modalities from being successful or beneficial to the respondent; in such an instance, DCF's obligation to make reasonable efforts at reunification would mandate that it offer such available services that might aid the respondent. In the present case, however, DCF, aware of the respondent's difficulty at participating in group psychotherapy, did refer the respondent to individual therapy. Moreover, the respondent himself completely undermined his attorneys' claim that the respondent could not benefit from group drug treatment by admitting to Dr. Randall that he had not made sincere efforts in the past to benefit from the drug referrals that had been made. The court thus rejects the claim of respondent's counsel that the services and referrals provided by DCF were not reasonable or appropriate. To the contrary, this court expressly finds that DCF made reasonable efforts to reunite Mr. D. with his daughter as required by the federal Adoption Assistance and Child Welfare Act of 1980.
 3. The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order — § 17a-112 (k)(3)
On June 17, 1998, the court, Quinn, J., entered an order of Expectations that the respondent father should fulfill to improve his chances of reunification with Samantha. Those expectations directed Mr. D to:
 • Keep all appointments set by or with DCF. In a literal sense it might be said that Mr. D. complied with this expectation, as there was no evidence he ever missed an appointment set by DCF. Yet by not keeping contact with DCF for many months, he effectively made himself unavailable either to DCF or his child. Hence, DCF could not make appointments for him due to his unavailability.
 • Keep his whereabouts known to DCF and his attorney. Mr. D. failed to comply with this CT Page 8988 expectation. For many months, his whereabouts was unknown to either DCF or his attorney.
 • Visit the child as often as DCF permits. Here, as above, it might be argued that the respondent complied with this expectation, as there was no evidence that he ever failed to attend a visit permitted by DCF. When DCF suspended his visitations in 1998 until he sought treatment for some of his problems, however, Mr. D.'s response was to (a) reject that suggestion and (b) sever ties with his daughter by never seeing her again (except for the court-ordered evaluation). DCF would have permitted and encouraged visitation had he sought help for his problems. In view of all the evidence therefore, it is obvious, and the court so finds, that Mr. D. did not comply with this expectation. DCF would have permitted additional visitation had he sought treatment.
 • Participate in parenting counseling, drug and alcohol counseling, and inpatient substance abuse treatment as recommended by United Services. As discussed above, Mr. D. failed to comply with this expectation.
 • No substance abuse. Mr. D. failed to comply with this expectation. The evidence discloses he continued to use marijuana all the way through the time of his psychological evaluation by Dr. Randall in 2000.
 • No further involvement with criminal justice system. Mr. D. failed to comply with this expectation. He was convicted of assault in the third degree in March 1999 and possession of drugs/marijuana in February 2000, both offenses occurring after the order of Expectations entered by the curt in June 1998.
4. The age of the child — § 17a-112 (k)(5)
Samantha is four years old.
 5. The efforts the parent has made to adjust his circumstances. conduct, or conditions to make it in the best interest of the child to return him to his CT Page 8989 home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child — § 17a-112 (k)(6).
The court finds that Mr. D. did not make reasonable efforts to adjust his circumstances, conduct or conditions to make it in Samantha's best interest to be reunited with him. He failed to participate in treatment that would have helped address his psychiatric or substance abuse problems. He did not keep in contact with either Samantha or DCF.
 6. The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent — § 17a-112 (k)(7).
No unreasonable act of the other parent or any other person prevented Mr. D. from maintaining a reasonable relationship with his daughter. His economic circumstances played no part m his inability to maintain such a relationship.
B. Best Interests of the Child — § 17a-112 (j)(2)
The court is next called upon to determine whether termination of the parental rights of would be in Samantha's best interest.[5] From the evidence offered at trial, the court finds by clear and convincing evidence, for the many reasons stated above and below, that it is in Samantha's best interest to terminate the paternal rights of her biological father, the respondent Raymond D.
The court's analysis of Samantha's best interest begins with her age and needs. It is remarkable and fortunate that, despite the numerous foster placements during her three years in DCF custody, Samantha is a normal child without any known or diagnosed psychological or behavioral problems. Yet a child of such young age cannot wait forever, or even indefinitely, for her father to address successfully his many problems. Indeed, not only was Mr. D. unprepared and unable to raise his child and meet her needs as of the adjudicatory date or time of trial; the evidence shows no present prospect that Mr. D. will ever be able to do so. The CT Page 8990 court finds completely credible the testimony and written report of Dr. Nancy Randall and the testimony of DCF social worker Diane LaGrega that Samantha, in view of her age and the length of time she has been in foster care, needs a permanent and stable home now, rather than waiting any longer.
One cannot read Dr. Randall's report or hear her testimony without feelings of compassion and sympathy for Mr. D. Traumatic brain injury, severe anxiety disorder, depression — these are all formidable problems, and obviously interfere with his day-today functioning. Yet rather than seeking individual therapy or psychotropic medication to alleviate his anxiety or depression, he has resorted to the illegal use of marijuana to calm his nerves. His "self-medication" with illegal substances has, moreover, been unsuccessful; it has neither cured the feelings of severe anxiety and depression that plague him not prevented him from continuing to get arrested for assaultive behavior. Dr. Randall's report concluded that he "desperately" needs good psychiatric care to treat his anxiety disorder, and that only then would he be likely to be successful in recovering from substance abuse. The picture of Mr. D. presented at trial thus establishes clearly and convincingly that he is now unable to care for Samantha and may never be able to do so. Samantha's needs for stability and permanence require that she not wait an indefinite period for psychiatric and substance abuse recovery by her father that may never occur.
The court thus finds by clear and convincing evidence that it is the best interest of Samantha to terminate the parental rights of Raymond D.
 IV — ORDER OF TERMINATION
The court, having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights and having determined, upon all of the facts and circumstances presented, that it is in Samantha's best interest to terminate the parental rights of Raymond D. hereby ORDERS:
The parental rights of Raymond D. Sr. are hereby terminated as to Samantha D.
Further orders of termination are contained in a separate order available to both parents and their counsel.
BY THE COURT
STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT CT Page 8991 CHILD PROTECTION SESSION